NO. COA13-344

NORTH CAROLINA COURT OF APPEALS

Filed: 4 March 2014

PREMIER, INC.,
    Plaintiff,

    v.                                    Mecklenburg County
                                          No. 11 CVS 1054
DAN PETERSON; OPTUM COMPUTING
SOLUTIONS, INC.; HITSCHLER-CERA,
LLC; DONALD BAUMAN; MICHAEL
HELD; THE HELD FAMILY LIMITED
PARTNERSHIP; ROBERT WAGNER;
ALEK BEYNENSON; I-GRANT
INVESTMENTS, LLC; JAMES MUNTER;
GAIL SHENK; STEVEN E. DAVIS;
CHARLES W. LEONARD, III and JOHN
DOES 1-10,
    Defendants.


        Appeal by defendants from order entered 11 December 2012 by

Judge Calvin E. Murphy in Mecklenburg County Superior Court.

Heard in the Court of Appeals 29 August 2013.


        *Moore & Van Allen, PLLC, by J. Mark Wilson, Kathryn G.
        Cole, and Benjamin R. Huber, for plaintiff-appellee.*

        *Williams Mullen, by Christopher G. Browning, Jr. and
        Garrick A. Sevilla, for defendants-appellants.*


        DAVIS, Judge.


        Dr.   Dan   Peterson   ("Dr.   Peterson");   Optum   Computing

Solutions,   Inc.;   Hitschler-Cera,   LLC;   Donald   Bauman;   Michael

Held; the Held Family Limited Partnership; Robert Wagner; Alek Beynenson; I-Grant Investments, LLC; James Munter; Gail Shenk; Steven E. Davis; Charles W. Leonard, III; and John Does 1-10 (collectively "Defendants") appeal from the trial court's 11 December 2012 order granting summary judgment in favor of Plaintiff Premier, Inc. ("Premier") on (1) its claim for a declaratory judgment that it did not breach its contract with Defendants; and (2) Defendants' counterclaims for breach of contract, attorneys' fees, and recovery of audit expenses. After careful review, we vacate the trial court's order granting summary judgment and remand for further proceedings.

### Factual Background

On 29 September 2006, Premier acquired Cereplex, Inc. ("Cereplex") by entering into a Stock Purchase Agreement (the "Agreement") with Defendants, the former shareholders and stakeholders of Cereplex. Cereplex developed and designed web-based surveillance and analytic services to healthcare providers through its software products, Setnet and PharmWatch. Setnet was designed to assist healthcare providers in detecting, responding to, and preventing healthcare-associated infections ("HAIs"). HAIs are infections that patients acquire during their course of treatment in a healthcare facility or setting.

The Setnet program provided various alerts, reports, and other monitoring and surveillance functions regarding the possible presence of HAIs in healthcare providers' patient population.

PharmWatch was a program designed to optimize treatment, curb resistance to antibiotics, and prevent unnecessary use or overuse of antibiotics. The PharmWatch product provided automated surveillance and monitoring by generating alerts to notify a healthcare provider of a potential problem in the provision and dosage of antibiotics to a particular patient.

After acquiring Cereplex, Premier developed SafetySurveillor, a successor product that combined the functionalities of Setnet and PharmWatch into one software program. SafetySurveillor, like its predecessors, generates automated alerts to notify the user of potential problems that require attention. SafetySurveillor's key features relate to its ability to (1) facilitate infection prevention by firing alerts to infection control professionals regarding the potential existence of clusters or outbreaks of HAIs; and (2) provide configurable pharmacological-related alerts based on set variables, including high-cost medication, drug combinations, length of therapy, lab results, and other factors.

Pursuant to the Agreement, Defendants were entitled to

receive an annual earnout payment (the "Earnout Amount") from Premier for five years following the date of the Agreement.  The Earnout Amount provision of the Agreement states, in pertinent part, as follows:

> (iii) <u>Earnout</u>.  On each of the dates that are the first five (5) anniversaries of the Closing Date, the Earnout Amount earned during the preceding twelve (12) months shall be determined by the Buyer in good faith (the "Yearly Earnout"). . . . "Earnout Amount" shall mean an amount equal to $12,500 for each Hospital Site where a Product Implementation occurs during the applicable 12-month period; excluding the first fifty (50) Hospital Sites where a Product Implementation occurs . . . . For the avoidance of doubt the first fifty (50) Hospital Site threshold is a one-time threshold, not an annual threshold. "Hospital Site" shall mean an individual hospital, nursing home, care center or similar facility (and for the avoidance of doubt a single health care company or hospital group may consist of multiple Hospital Sites).  "Product Implementation" means a Hospital Site that has (A) subscribed to or licensed the Company's Setnet or PharmWatch product (or any derivative thereof, successor product, or new product that substantially replaces the functionality of either product), whether such product is provided, sold or licensed (for a charge or at no charge, or provided on a stand-alone basis or bundled with other products and/or services) to the applicable Hospital Site by Company (or its successor in interest), any affiliate of the Company or any reseller authorized by the Company, and (B) completed any applicable implementation, configuration and testing of

> the product so that the product is ready for production use by the Hospital Site. Together with the delivery of each Yearly Earnout, the Buyer shall provide the Sellers' Representative with a written report listing the names and addresses of the Hospital Sites covered by the applicable Yearly Earnout payment.

The Agreement provided that Defendants were authorized to conduct an annual audit to verify that Premier was paying out the correct Earnout Amount to Defendants. Defendants were responsible for paying the expenses associated with the audit unless the audit revealed that Premier had underpaid the Earnout Amount by more than 5%. If the applicable Earnout Amount was in dispute, Premier would not have any obligation to pay the costs and expenses of the audit "unless a final, nonappealable order of a court or an arbitrator that is binding on [Premier] finds that the Audit findings are correct."

From May 2010 to September 2010, Dr. Peterson, the co-founder and former Chief Executive Officer of Cereplex, conducted a pilot audit on Defendants' behalf regarding Premier's compliance with the Agreement. Dr. Peterson testified by affidavit that in determining the appropriate Earnout Amount that Defendants were due, his audit "reported on the occurrence of single-event alerts as a simple and sure way to identify

Product Implementations of SafetySurveillor[1] for the Audit." A single-event alert refers to the notification the SafetySurveillor program dispatches to infection control professionals or other designated medical personnel to identify either (1) the potential presence of an HAI in a patient who was discharged from a hospital and later sought medical attention from another healthcare facility; or (2) a possible problem with the antibiotic therapy prescribed to a patient.

Dr. Peterson examined Premier's databases and discovered over 1,000 healthcare facilities from which an alert had been fired. His affidavit states that "[e]ach alert relates to an individual patient and is specific to the facility at which that patient was seen, and each alert was sent to at least one clinician who had chosen to be alerted about the event." He also explained that in order for an alert to be fired from a facility, the SafetySurveillor program must have acquired access to the facility's patient data.

The conclusion reached by Dr. Peterson from his audit was that Premier had provided SafetySurveillor to over 1,000 facilities yet had only recognized 263 Hospital Sites for

---

[1] SafetySurveillor, the successor product of Setnet and PharmWatch, replaced those two software programs and was the only relevant product for purposes of Product Implementation in 2010.

purposes of the Product Implementation provision of the Agreement. Based on Dr. Peterson's audit, Defendants informed Premier that they intended to initiate litigation against Premier for miscalculating the Earnout Amount and violating the terms of the Agreement.

On 19 January 2011, Premier filed an action in Mecklenburg County Superior Court seeking a declaratory judgment that it had not breached the Agreement. On 27 April 2011, Defendants filed an answer and counterclaims. Defendants alleged that Premier had, in fact, breached its contract with Defendants and sought damages as well as the recovery of audit expenses and attorneys' fees. The matter was designated a complex business case and assigned to the Honorable Calvin E. Murphy.

On 29 July 2011, the trial court entered a case management order giving the parties until 30 April 2012 to complete fact discovery and until 31 July 2012 to complete all discovery. On 30 August 2011, approximately 40 days after the entry of the case management order, Premier filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure or, in the alternative, a motion for summary judgment pursuant to Rule 56.

The trial court conducted a hearing on 14 December 2011 and

entered its order and opinion on 11 December 2012 granting summary judgment in Premier's favor on its declaratory judgment claim as well as on Defendants' counterclaims for breach of contract, attorneys' fees, and recovery of audit expenses.[2] Defendants appealed to this Court.

## Analysis

On an appeal from an order granting summary judgment, this Court reviews the trial court's decision *de novo*. *Shroyer v. Cty. of Mecklenburg*, 154 N.C. App. 163, 167, 571 S.E.2d 849, 851 (2002). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Dockery v. Quality Plastic Custom Molding, Inc.*, 144 N.C. App. 419, 421, 547 S.E.2d 850, 852 (2001).

In a contract dispute between two parties, the trial court may interpret a plain and unambiguous contract as a matter of law if there are no genuine issues of material fact. *See McKinnon v. CV Indus., Inc.*, 213 N.C. App. 328, 333, 713 S.E.2d

---

[2] The trial court granted summary judgment in favor of Defendants on Premier's claim for attorneys' fees after concluding that there was no statutory basis for an award of attorneys' fees in Premier's favor.

495, 500 ("Courts may enter summary judgment in contract disputes because they have the power to interpret the terms of contracts."), *disc. review denied*, 365 N.C. 353, 718 S.E.2d 376 (2011); *Metcalf v. Black Dog Realty, LLC*, 200 N.C. App. 619, 633, 684 S.E.2d 709, 719 (2009) ("[W]hen the language of a contract is not ambiguous, no factual issue appears and only a question of law which is appropriate for summary judgment is presented to the court.").

"Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution." *Lane v. Scarborough*, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973). In determining the parties' intent, the court must construe the contract "in a manner that gives effect to all of its provisions, if the court is reasonably able to do so." *Johnston Cty. v. R.N. Rouse & Co.*, 331 N.C. 88, 94, 414 S.E.2d 30, 34 (1992).

The key language in the Agreement that lies at the heart of this dispute states as follows:

> "Product Implementation" means a Hospital Site that has (A) *subscribed to or licensed* the Company's Setnet or PharmWatch product (or any derivative thereof, successor product, or new product that substantially replaces the functionality of either product), *whether such product is provided, sold or licensed* (for a charge or at no

> charge, or provided on a stand-alone basis or bundled with other products and/or services) to the applicable Hospital Site by Company (or its successor in interest), any affiliate of the Company or any reseller authorized by the Company . . . .

(Emphasis added.)

The parties offer different views on how the italicized language quoted above should be interpreted. Relying on the "subscribed to or licensed" phrase, Premier contends that in order for Product Implementation to occur, a Hospital Site must affirmatively take steps to subscribe to or license the SafetySurveillor product. Based on this interpretation, Premier claims that it fully satisfied its obligations under the Agreement by making Earnout payments for 213 of the 263 Hospital Sites that had formal written subscription agreements with Premier.[3]

Defendants, conversely, assert that Premier's interpretation of Product Implementation is too narrow. They argue that the "whether such product is provided, sold or licensed" phrase broadens the circumstances under which an annual Earnout payment can accrue. As such, Defendants contend

---

[3] Pursuant to the Agreement, the first 50 Hospital Sites where Product Implementation occurs are excluded when calculating the appropriate Earnout Amount total. Thus, payment was made for only 213 of these 263 Hospital Sites.

that the "subscribed to or licensed" component of Product Implementation is satisfied simply by virtue of Premier's provision of the SafetySurveillor product to a facility. Based on this reasoning, Defendants contend that Premier was not entitled to summary judgment because the results of Dr. Peterson's audit — specifically the data showing the numerous facilities from which single-event alerts were fired — indicated that Premier had "provided" the SafetySurveillor program to over 1,000 facilities, thereby causing Product Implementation to occur *regardless* of whether those facilities had actually taken steps to subscribe to or license the product.

Premier responds by arguing that Defendants' interpretation of Product Implementation reads the "subscribed to or licensed" language out of the Agreement. Defendants' interpretation, according to Premier, treats the "subscribed to or licensed" phrase as having been effectively superseded by the "whether such product is provided, sold or licensed" phrase.

In its order and opinion, the trial court agreed with Premier's interpretation of the Agreement, ruling that a Hospital Site was required to subscribe to or license the product in order for Product Implementation to occur. The trial court harmonized the "subscribed to or licensed" phrase with the

"whether such product is provided, sold or licensed" phrase by determining that "while it does not matter who provides the product to the Hospital Site or whether the Hospital Site is charged, the Hospital Site *still must subscribe to or license the product* in order for 'Product Implementation' to occur." (Emphasis added.)

The trial court, therefore, rejected Defendants' contention that they would be entitled to an Earnout payment any time SafetySurveillor was "merely provided" to a Hospital Site because that interpretation "unreasonably construes the otherwise unambiguous language of the contract that requires a license or subscription." Based on its interpretation of the Product Implementation definition in the Agreement, the trial court concluded that summary judgment in favor of Premier was appropriate.

We agree with the trial court that Defendants' interpretation would impermissibly read the phrase "subscribed to or licensed" out of the Agreement. *See Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629, 588 S.E.2d 871, 875 (2003) (explaining that when interpreting a contract "[t]he various terms of the contract are to be harmoniously construed, and if possible, every word and every provision is to be given

effect" (citation and brackets omitted)). Defendants' argument hinges on the notion that Product Implementation can occur simply by virtue of a facility's receipt of the SafetySurveillor product. However, the unmistakable meaning of the language the parties agreed upon in drafting the Agreement is that some affirmative act on the part of the Hospital Site is required. Defendants simply cannot escape the fact that the definition of Product Implementation makes clear that it is the *Hospital Site* that must "subscribe[] to or license[]" the product. Thus, contrary to Defendants' proffered interpretation, the mere receipt of SafetySurveillor by a facility is, standing alone, insufficient to trigger an Earnout payment under the Agreement.

However, our adoption of this interpretation of the Product Implementation definition does not resolve the case. To hold, as we do, that a Hospital Site must subscribe to or license the product in order for Product Implementation to occur is to raise the question of whether the additional facilities that Defendants contend qualify as Hospital Sites at which Product Implementation has occurred have, in fact, affirmatively undertaken steps to subscribe to or license the SafetySurveillor product.

It is well established that in construing contract

provisions, "[w]here a contract defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Reaves v. Hayes*, 174 N.C. App. 341, 345, 620 S.E.2d 726, 729 (2005) (citation and quotation marks omitted). As neither "subscribed" nor "licensed" is defined in the Agreement, it is appropriate to examine the ordinary and plain meaning of these terms.

"Subscribe" means "to agree to receive and pay for a periodical, service, etc." Webster's New World Dictionary 588 (1995). The most applicable dictionary definition of the word "license" is "official or legal permission to do or own a specified thing." American Heritage College Dictionary 782 (3d ed. 1993). Both definitions connote an affirmative act by the recipient prior to receipt of the product or service — be it the act of agreeing to receive the product or service or the act of obtaining permission to use the product or service. Applying these definitions here, we believe that the Agreement contemplates a mutual arrangement between Premier and the Hospital Site whereby Premier agrees to provide the SafetySurveillor product and the Hospital Site agrees to accept

it and utilize its services.[4]

While the trial court correctly interpreted the Agreement as requiring the Hospital Site to take some action to subscribe to or license SafetySurveillor, we cannot agree with the trial court's conclusion that summary judgment was appropriate at this stage in the litigation. Defendants submitted evidence, consisting primarily of the affidavit of Dr. Peterson, suggesting that Premier provided SafetySurveillor to numerous additional facilities (beyond the 263 Hospital Sites acknowledged by Premier in its calculation of the Earnout Amount) for which no payment was made. Premier does not dispute Defendants' contention that alerts were fired from these facilities but claims that (1) there is no evidence that any of the facilities identified have subscribed to or licensed SafetySurveillor; and (2) evidence of the firing of alerts is not relevant to the issue of whether a facility has subscribed to or licensed SafetySurveillor.

While we have rejected Defendants' contention that evidence

---

[4] However, because the Agreement expressly states that an Earnout payment can be triggered — assuming the other requirements are met — regardless of whether the product is provided "for a charge or at no charge," payment by the Hospital Site is not required. Similarly, an Earnout payment can be triggered whether SafetySurveillor is offered on a stand-alone basis or as part of a bundle of other products and services.

of Premier's mere provision of the SafetySurveillor product to facilities, without more, automatically triggers Product Implementation, we believe that such evidence (as shown by the firing of alerts) and the circumstances under which the product came to be received by these facilities is probative of the issue of whether the facilities did, in fact, meet the criteria for Product Implementation. However, as presently constituted, the record is devoid of specific evidence on this issue. It may or may not ultimately be determined that additional facilities beyond the 263 acknowledged by Premier qualify as Hospital Sites as to which Product Implementation has occurred; however, on the present record, we have no way of knowing the answer to this question.

In its complaint, Premier summarized the relief it was seeking as follows:

> 30. Plaintiff is entitled to a judgment declaring that it has not violated any purported rights of Defendants pursuant to the Stock Purchase Agreement or otherwise under federal, state or common law, and is not liable to Defendants for any claims, including any claims concerning the parties' respective rights or obligations pursuant to the Stock Purchase Agreement. . . .

As the party seeking summary judgment, Premier bore "the initial burden of demonstrating the absence of a genuine issue of

material fact" as to whether it had fully satisfied its payment obligations under the Agreement. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, ___ N.C. App. ___, ___, 742 S.E.2d 535, 540 (2012) (citation and quotation marks omitted).

The trial court appears to have reasoned that Premier met this burden because (1) Product Implementation could only occur when a Hospital Site entered into a formal written agreement with Premier; and (2) neither party produced evidence "that refutes the fact that [Premier] paid Defendant[s] for each Hospital Site that subscribed to or licensed the product" through a formal, written subscription or licensing agreement. However, as explained above, while the Agreement requires some affirmative act by a Hospital Site to subscribe to or license the SafetySurveillor product in order for Product Implementation to occur, the Agreement does not specifically require a formal, written agreement between Premier and the Hospital Site. The fact that Product Implementation can occur even when the SafetySurveillor product is provided to the Hospital Site at no cost suggests that a more informal process may, in fact, have existed.

The trial court also concluded that Dr. Peterson's affidavit constituted parol evidence that attempted to

impermissibly add to or revise the unambiguous language of the Agreement. We agree that Dr. Peterson's affidavit about the parties' intent when negotiating the Agreement should not be allowed to alter the contractual terms that the parties agreed upon as contained in the four corners of the Agreement; however, as explained above, we believe that Dr. Peterson's affidavit contained evidence probative on the issue of whether the additional facilities referenced in his audit may have subscribed to or licensed SafetySurveillor. Accordingly, further factual development is necessary to explore what affirmative acts — if any — were taken by the facilities identified by Defendants to obtain the SafetySurveillor product so that any such acts can be evaluated in accordance with our interpretation of the "subscribed to or licensed" language in the Agreement.

For these reasons, we conclude that this matter must be remanded to the trial court for a fuller development of the factual record. While we do not foreclose the possibility that summary judgment may ultimately be appropriate in this matter, we believe that such a determination cannot properly be made at the present time in light of the incomplete factual record that currently exists. *See Ussery v. Taylor*, 156 N.C. App. 684, 686,

577 S.E.2d 159, 161 (2003) (reversing premature entry of summary judgment and remanding to give parties "the opportunity to further develop the facts"). Because we are vacating the entry of summary judgment and remanding for further proceedings, we also vacate the trial court's rulings on both parties' claims for attorneys' fees. We express no opinion as to whether either party may be entitled to attorneys' fees once the trial court has rendered a final judgment in this action on remand.

## Conclusion

For the reasons stated above, we vacate the trial court's order and opinion and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED.

Judges CALABRIA and STROUD concur.