Premier, Inc. v. Peterson, 2016 NCBC 39.

<table>
<tr><td>STATE OF NORTH CAROLINA</td><td>IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION</td></tr>
<tr><td>COUNTY OF MECKLENBURG</td><td>11 CVS 1054</td></tr>
</table>

PREMIER, INC.,

                  Plaintiff,

v.

DAN PETERSON; OPTUM COMPUTING SOLUTIONS, INC.; HITSCHLER-CERA, LLC; DONALD BAUMAN; MICHAEL HELD; THE HELD FAMILY LIMITED PARTNERSHIP; ROBERT WAGNER; ALEK BEYNENSON; I-GRANT INVESTMENTS, LLC; JAMES MUNTER; GAIL SHENK; STEVEN E. DAVIS; CHARLES W. LEONARD, III and JOHN DOES 1-10,

                  Defendants.

**ORDER AND OPINION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ENTRY OF DECLARATORY JUDGMENT**

{1}    **THIS MATTER** is before the Court upon Plaintiff Premier, Inc.'s ("Premier") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Motion") in the above-captioned case. Having considered the Motion, the briefs in support of and in opposition to the Motion, the appropriate evidence of record, and the arguments of counsel at the hearing on the Motion, the Court hereby **GRANTS** the Motion and **ENTERS** a declaratory judgment in favor of Plaintiff as provided herein.

> *Moore & Van Allen, PLLC, by J. Mark Wilson, for Plaintiff Premier, Inc.*

> *The Spence Law Firm, LLC, by Mel C. Orchard, III, and Tin, Fulton, Walker & Owen, PLLC, by Sam McGee, for Defendants Dan Peterson; Optum Computing Solutions, Inc., Hitschler-Cera, LLC, Donald Bauman, Michael Held, The Held Family Limited Partnership, Robert Wagner, Alek Beynenson, I-Grant Investments, LLC, James Munter, Gail Shenk, Steven E. Davis, Charles W. Leonard, III, and John Does 1-10.*

Bledsoe, Judge.

# I.

## PROCEDURAL AND FACTUAL BACKGROUND

{2} This lawsuit arises out of a dispute concerning unpaid earnout payments that Defendants allege they were entitled to receive pursuant to a stock purchase agreement between the parties. Premier filed this lawsuit in 2011 seeking a declaratory judgment determining that it had not breached the parties' agreement, and Defendants filed counterclaims for breach of contract and the recovery of certain audit expenses and attorneys' fees. Premier's Motion seeks summary judgment on its claim for declaratory relief, as well as on Defendants' counterclaims.

{3} On September 29, 2006, Premier acquired Cereplex, Inc. ("Cereplex") by entering into a Stock Purchase Agreement (the "Agreement") with Defendants, who are the former shareholders of and stakeholders in Cereplex. (*See* Pl.'s Mem. Supp. Mot. J. on the Pleadings or Summ. J. Ex. 1, hereinafter "Agmt.".) Cereplex developed and designed web-based surveillance and analytic services to healthcare providers through its software products, Setnet and PharmWatch. (Peterson Aff. Sept. 29, 2011 ¶ 3.) After acquiring Cereplex, Premier developed SafetySurveillor, a successor product that combined the functionalities of Setnet and PharmWatch into one software program. (Peterson Aff. ¶ 8.) SafetySurveillor, like its predecessors, generates automated alerts to notify the user of potential medical problems that require attention. (Peterson Aff. ¶ 9.) SafetySurveillor's key features relate to its ability to (i) facilitate infection prevention by firing alerts to infection control professionals or other designated medical personnel regarding the potential existence of clusters or outbreaks of healthcare-associated infections, (Peterson Aff. ¶¶ 5, 9); and (ii) provide configurable pharmacological-related alerts to medical personnel based on set variables, including high-cost medication, drug combinations, length of therapy, lab results, and other factors, (Peterson Aff. ¶ 11).

{4} The Agreement provides that Defendants were to receive an annual earnout payment from Premier (the "Earnout Payment") each year for five years following the date of the Agreement. (Agmt. § 2(b)(iii).) The Agreement provides

that the Earnout Payment was to be in "an amount equal to $12,500 for each Hospital Site where a Product Implementation occurs during the applicable 12-month period[.]" (Agmt. § 2(b)(iii).)

{5}     "Hospital Site" is defined in the Agreement as "an individual hospital, nursing home, care center or similar facility (and for the avoidance of doubt a single health care company or hospital group may consist of multiple Hospital Sites)." (Agmt. § 2(b)(iii).)

{6}     "Product Implementation" is defined in the Agreement as:

> a Hospital Site that has (A) subscribed to or licensed the Company's Setnet or PharmWatch product (or any derivative thereof, successor product, or new product that substantially replaces the functionality of either product), whether such product is provided, sold or licensed (for a charge or at no charge, or provided on a stand-alone basis or bundled with other products and/or services) to the applicable Hospital Site by Company (or its successor in interest), any affiliate of the Company or any reseller authorized by the Company, and (B) completed any applicable implementation, configuration and testing of the product so that the product is ready for production use by the Hospital Site.

(Agmt. § 2(b)(iii).)

{7}     The Agreement further provides that Defendants were authorized to conduct an annual audit to verify that Premier was paying the correct Earnout Payment to Defendants each year. Defendants were responsible for paying the expenses associated with the annual audit, unless the audit revealed that Premier had underpaid the required Earnout Amount by more than five percent. (Agmt. § 6(e).)

{8}     In order for SafetySurveillor to fire an alert, Premier must have access to a Hospital Site's data, which includes protected health information ("PHI"). (Davis Dep. 14:18–14:23.) According to Defendants, PHI cannot be provided unless express permission is given from the Hospital Site. (Davis Aff. ¶¶ 3–4.) Generally, Hospital Site permission comes in the form of a Business Associate Agreement ("BAA"), which grants permission for a Hospital Site's PHI to be shared with Premier. (Pope Dep. 61:23–62:1.) Although Premier enters into BAAs with some individual Hospital Sites from time to time, more commonly Premier enters into BAAs with

hospital networks that cover the individual Hospital Sites within each network. (Pope Dep. 63:18–63:23, 64:13–64:22.) Thus, according to Defendants, under applicable federal regulations, for a Hospital Site to generate an alert, the Hospital Site must have provided PHI to Premier subject to a BAA. (Pope Dep. 61:23–62:1.)

{9} Between May 2010 and September 2010, Defendant Dan Peterson ("Dr. Peterson"), the co-founder and former Chief Executive Officer of Cereplex, conducted a pilot audit so that Defendants could assess Premier's compliance with the Earnout Payment obligations under the Agreement. (Peterson Aff. ¶ 23.) According to Dr. Peterson, his audit "reported on the occurrence of single-event alerts as a simple and sure way to identify Product Implementations of SafetySurveillor." (Peterson Aff. ¶ 26.) A single-event alert refers to the notification the SafetySurveillor program dispatches to infection control professionals or other designated medical personnel to identify either (i) the potential presence of a healthcare-associated infection in a patient who was discharged from a Hospital Site and later sought medical attention from another Hospital Site; or (ii) a possible problem with the antibiotic therapy prescribed to a patient. (Peterson Aff. ¶ 9.)

{10} In conducting the audit, Dr. Peterson discovered that alerts had been fired from over 1,000 healthcare facilities. (Defs.' Answer and Countercls. Ex. B.) According to Dr. Peterson, "[e]ach alert relates to an individual patient and is specific to the facility at which that patient was seen, and each alert was sent to at least one clinician who had chosen to be alerted about the event." (Peterson Aff. ¶ 26.) Dr. Peterson also averred that in order for an alert to be fired from a facility, the SafetySurveillor program must have acquired access to the facility's patient data. (Peterson Aff. ¶ 19.)

{11} Dr. Peterson concluded from his audit that Premier had provided SafetySurveillor to over 1,000 Hospital Sites but had only paid Earnout Payments based on 263 Hospital Sites under the Product Implementation provision of the Agreement. (Peterson Aff. ¶¶ 27–28.) Defendants thereafter advised Premier that Defendants should be paid Earnout Payments based on the use of the

SafetySurveillor product at the Hospital Sites identified in the audit that had used the product but for whose use Defendants had not been paid (the "Unlisted Facilities"). (Peterson Aff. ¶ 32.) After Premier refused payment, Defendants advised Premier that they intended to file suit against Premier for miscalculating the Earnout Payment and violating the terms of the Agreement. (Davis Dep. 79:13–79:18.)

{12} Subsequently, on January 19, 2011, Premier filed this action seeking a declaratory judgment that it had not breached the Agreement. The case was designated to this Court that same day, and assigned to Judge Calvin Murphy on January 21, 2011. On April 27, 2011, Defendants filed an answer and counterclaims for breach of contract and recovery of audit expenses and attorneys' fees.

{13} On August 30, 2011, Premier filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure or, in the alternative, a motion for summary judgment pursuant to Rule 56. This Court (Murphy, J.) granted summary judgment in favor of Premier on both its declaratory judgment claim and on Defendants' counterclaims on December 11, 2012 ("Judge Murphy's Order").

{14} Defendants appealed Judge Murphy's Order and, on March 4, 2014, the Court of Appeals issued its opinion resolving Defendants' appeal ("Court of Appeals' Opinion"). *Premier, Inc. v. Peterson*, 232 N.C. App. 601, 755 S.E.2d 56 (2014). The Court of Appeals reversed Judge Murphy's Order, concluding that summary judgment was improperly entered, and remanded the case to this Court for "further factual development" to determine whether Premier breached the Agreement. *Id.* at 610, 755 S.E.2d at 62.

{15} In reaching its decision, the Court of Appeals specifically interpreted the phrase "subscribed to or licensed" in the critical provision of the Agreement defining "Product Implementation," (Agmt. § 2(b)(iii)), and concluded, as a matter of law, as follows:

> [T]he unmistakable meaning of the language the parties agreed upon in drafting the Agreement is that some affirmative act on the part of the Hospital Site is required. Defendants simply cannot escape the fact that the definition of Product Implementation makes clear that it is the *Hospital Site* that must "subscribe[] to or license[]" the product. . . . [T]he mere receipt of SafetySurveillor by a facility is, standing alone, insufficient to trigger an Earnout Payment under the Agreement.

*Id.* at 607, 755 S.E.2d at 60. Consistent with this conclusion, the Court of Appeals further concluded that "the Agreement contemplates a mutual arrangement between Premier and the Hospital Site whereby Premier agrees to provide the SafetySurveillor product and the Hospital Site agrees to accept it and utilize its services." *Id.* at 608, 755 S.E.2d at 61. Finally, the Court of Appeals remanded the case to this Court, specifically instructing that "further factual development is necessary to explore what affirmative acts—if any—were taken by the facilities identified by Defendants to obtain the SafetySurveillor product so that any such acts can be evaluated in accordance with our interpretation of the 'subscribed to or licensed' language in the Agreement." *Id.* at 610, 755 S.E.2d at 62.

{16} After remand, the parties submitted a joint Case Management Report on June 26, 2014 advising that they had agreed that fact discovery would follow a two-phased sequence: the first phase to consist of fact witness depositions, and the second phase to consist of written discovery (the "Sequencing Agreement").

{17} On June 30, 2014, the Court (Murphy, J.) entered an Amended Case Management Order (the "CMO") establishing new deadlines for discovery and providing that the parties would have through and including November 1, 2014 to conduct fact discovery as contemplated under the Sequencing Agreement (the "Initial Fact Discovery Deadline").

{18} On the evening of October 31, 2014, the day before the Initial Fact Discovery Deadline was to expire, Defendants served their First Set of Interrogatories and Requests for Production of Documents. Thereafter, on November 21, 2014, Premier filed a Motion for Protective Order seeking the Court's ruling that Defendants' discovery requests were untimely under Rule 18.8 of the

General Rules of Practice and Procedure for the North Carolina Business Court ("Business Court Rule(s)") because the discovery could not be answered by the Initial Fact Discovery Deadline.[1]  Although Defendants had plainly failed to comply with Business Court Rule 18.8, the Court chose to give great deference to the Court of Appeals' directive to permit "fuller development of the factual record" concerning Premier's alleged breach, *Premier*, 232 N.C. App. at 610, 755 S.E. 2d at 62, and directed Premier by Order dated March 12, 2015 to serve responses to Defendants' tardy discovery requests.  The parties subsequently engaged in extensive written discovery and related document production.[2]

{19}   Premier timely filed the Motion on December 1, 2015, and briefing was completed on January 13, 2016.  The Court held a hearing on the Motion on February 26, 2016, and the Motion is now ripe for resolution.

II.

LEGAL STANDARD

{20}   Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C. R. Civ. P. 56(c).  The moving party

---

[1]  Business Court Rule 18.8 provides that "[t]he requirement that discovery be completed within a specified time means that adequate provisions must be made for interrogatories and requests for admission to be answered, for documents to be produced, and for depositions to be held within the discovery period."  BCR 18.8.

[2]  As the Court noted in its August 26, 2015 order:

> Since this case was remanded to this Court, the Court has sought to give full effect to the Court of Appeals' directive that this Court provide for "fuller development of the factual record," *Premier*, 755 S.E.2d at 62. In particular, the Court has permitted the parties to implement the Sequencing Agreement, pursuant to which Defendants elected to take three fact depositions in October 2014, and, over Plaintiff's vigorous objections regarding proper content and scope, has afforded Defendants a full and fair opportunity to obtain written discovery and over 26,300 pages of documents from Plaintiff consistent with the Court's understanding of the instructions contained in the Court of Appeals Opinion.

(Order Amending Amended Case Management Order (Second Revised) ¶ 11.)

has "the burden of showing there is no triable issue of material fact." *Farrelly v. Hamilton Square*, 199 N.C. App 541, 543, 459 S.E.2d 23, 25–26 (1995).

{21}   The movant may meet this burden "by showing either that: (1) an essential element of the non-movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the movant cannot surmount an affirmative defense which would bar the claim." *McKinnon v. CV Indus.*, 213 N.C. App. 328, 332, 713 S.E.2d 495, 499 (2011) (citations and internal quotation marks omitted).   In determining whether this burden has been met, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Whitley v. Cubberly*, 24 N.C. App. 204, 206–07, 210 S.E.2d 289, 291 (1974); *see generally McKee v. James*, 2014 NCBC LEXIS 74, at *13–14 (N.C. Super. Ct. Dec. 31, 2014) (discussing standard).

III.

ANALYSIS

{22}   The Agreement unambiguously provides that an annual Earnout Payment shall be paid to Defendants in "an amount equal to $12,500 for each Hospital Site where a Product Implementation occurs." (Agmt. § 2(b)(iii).)  The Agreement further provides, in part, that a Product Implementation "means a Hospital Site that has (A) subscribed to or licensed the [SafetySurveillor product]. . . ."  (Agmt. § 2(b)(iii).)

{23}   As noted above, the Court of Appeals concluded that "the unmistakable meaning of the language the parties agreed upon in drafting the Agreement is that some affirmative act on the part of the Hospital Site is required" for a Product Implementation to occur. *Premier*, 232 N.C. App. at 607, 755 S.E.2d at 60.  The Court specifically rejected Defendants' contention that the "subscribed to or licensed" language could be "satisfied simply by virtue of Premier's provision of the SafetySurveillor product to a facility," and instead held that "it is the *Hospital Site* that must 'subscribe[] to or license[]' the product," *id.*, because "the Agreement contemplates a mutual arrangement between Premier and the Hospital Site whereby Premier agrees to provide the SafetySurveillor product and the Hospital

Site agrees to accept it and utilize its services." *Id.* at 608, 755 S.E.2d at 61. Having reached that conclusion, the Court of Appeals instructed that further factual development be permitted in this Court to "explore what affirmative acts—if any—were taken by the facilities identified by Defendants to obtain the SafetySurveillor product *so that any such acts can be evaluated in accordance with our interpretation of the 'subscribed to or licensed' language in the Agreement.*" *Id.* at 610, 755 S.E.2d at 62 (emphasis added).

{24} The Court concludes that the Court of Appeals' interpretation of the Agreement is binding on this Court under the law of the case doctrine. This well-established doctrine provides that "when an appellate court passes on a question and remands the cause for further proceedings, the questions there settled become the law of the case . . . in subsequent proceedings in the trial court." *Bank of Am., N.A. v. Rice*, 780 S.E.2d 873, 880 (N.C. Ct. App. 2015) (quoting *Hayes v. City of Wilmington*, 243 N.C. 525, 536, 91 S.E.2d 673, 681–82 (1956)). The doctrine applies to "points actually presented and necessary to the determination of the case,"*Condollene v. Condollene*, 137 N.C. App. 547, 551, 528 S.E.2d 639, 642 (2000), and requires that "[n]o judgment other than that directed or permitted by the appellate court may be entered." *D & W, Inc. v. City of Charlotte*, 268 N.C. 720, 722, 152 S.E.2d 199, 202 (1966). As a result, "[o]n the remand of a case after appeal, the mandate of the reviewing court is binding on the lower court, and must be strictly followed, without variation and departure." *Couch v. Private Diagnostic Clinic*, 146 N.C. App. 658, 667, 554 S.E.2d 356, 363 (2001) (citations and quotation marks omitted), *disc. rev. denied and appeal dismissed*, 355 N.C. 348, 563 S.E.2d 562 (2002). Accordingly, based on the Court of Appeals' interpretation of the Agreement, it is the law of this case that for a Product Implementation to occur under the Agreement, a Hospital Site must have taken some affirmative act to obtain the SafetySurveillor product.

{25} Much of Defendants' opposition to Premier's' Motion, however, is premised on Defendants' contention that the Court of Appeals mistakenly interpreted the "subscribe to or license" language in the Agreement and misunderstood how the

SafetySurveillor product was purchased, implemented, and used in actual practice. (Defs.' Br. Opp. Mot. Summ. J. 4.) In particular, Defendants argue that SafetySurveillor was marketed and sold to hospital systems, not individual facilities or Hospital Sites within those systems, and that the subscription agreements for the product were entered between Premier and the hospital systems or networks, not with the individual facilities or Hospital Sites. (Defs.' Br. Opp. Mot. Summ. J. 4.) As a result, Defendants argue that the Agreement should be read as providing that a Product Implementation occurs not only when the Hospital Site takes an affirmative act to obtain the SafetySurveillor product, but also when someone acting on behalf of the Hospital Site takes an affirmative act to obtain the product. (Defs.' Br. Opp. Mot. Summ. J. 19–22.) Construing the Agreement in this fashion, Defendants argue that they have brought forward evidence showing that affirmative acts were taken on behalf of the Unlisted Facilities to obtain the SafetySurveillor product sufficient to defeat Premier's Motion.

{26} The Court is not persuaded. First, it is undisputed that Defendants have not brought forward evidence showing that any Unlisted Facility took affirmative acts to obtain the SafetySurveillor product. For example, Dr. Peterson acknowledged this lack of evidence at his deposition:

> Q: So as we sit here today, you have no evidence to show that any of the thousand plus entities for which you believe you're entitled to an earnout have taken any affirmative acts on their own to subscribe to or license the SafetySurveillor product, correct?
> . . .
> A: At this very preliminary point, I do not have that.

(Peterson Dep. 15:13–15:24.)

> Q: As you sit here today, you have no facts to show that any of the entities for which you're claiming you are owed an earnout have agreed to utilize the services of SafetySurveillor, correct?
> A: Correct.

(Peterson Dep. 22:2–22:7.) Defendants offer no evidence to the contrary from any other Defendant, and likewise have not offered any evidence from any third party, including from any of the Unlisted Facilities.

{27} Unable to proffer specific evidence that any Unlisted Facility took affirmative acts to obtain the Safety Surveillor product, Defendants point to four alleged "affirmative acts" made on behalf of the Unlisted Facilities that Defendants contend create a genuine issue of material fact as to whether a Product Implementation occurred.

{28} First, Defendants contend that a hospital network's entry into a BAA with Premier on behalf of an individual Unlisted Facility constitutes an affirmative act by that Facility because under federal law a BAA must be in place for a Facility to send PHI to Premier. Defendants, however, have presented no evidence that a BAA existed between any Unlisted Facility and Premier. The Court concludes that evidence of a legal requirement requiring a BAA between Premier and the hospital networks is not evidence of an affirmative act taken by an Unlisted Facility, as required under the Court of Appeals' interpretation of the Agreement.

{29} Similarly, Defendants next argue that an affirmative act occurred each time an Unlisted Facility sent PHI to Premier because of the legal requirement that such information could not be transferred without a BAA between Premier and the hospital networks covering the Facility. Again, however, Defendants do not offer any evidence that any Unlisted Facilities (rather than the hospital networks) actually sent PHI to Premier, and, in any event, the Court concludes that any such evidence does not demonstrate an affirmative act taken by an Unlisted Facility as required under the Agreement.

{30} Defendants also contend that the creation of an alert by an Unlisted Facility constitutes an affirmative act because it demonstrates that the Facility has requested that an infection preventionist at the Facility receive an alert. Defendants, however, have presented no evidence showing that any of the Unlisted Facilities actually set up alerts, requested alerts, were ever sent an alert, or were aware that alerts were generated by SafetySurveillor. Moreover, even if an infection preventionist set up alerts for a Facility, Defendants have presented no evidence that the infection preventionist's action was actually taken by the Facility, rather than simply by the infection preventionist himself or for another entity. As

such, Defendants' evidence does not show an affirmative act taken by an Unlisted Facility under the Court of Appeals' Opinion.

{31} Finally, Defendants argue that the hospital networks should be deemed the agents of the Unlisted Facilities and that, therefore, the acts taken by the networks on behalf of the Facilities constitute acts of the Facilities themselves. The Court finds Defendants' argument without merit. First, Defendants did not plead agency in their answer or counterclaims, did not raise the issue in their opposition brief, and asserted the argument for the first time at the hearing on the Motion. Regardless, Defendants have not presented any evidence of the existence of an agency relationship between any of the hospital networks and any of the Facilities. "An agency relationship arises when parties manifest consent that one shall act on behalf of the other and subject to his control." *Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 74, 698 S.E.2d 757, 764 (2010) (internal quotation marks and citation omitted). In particular, Defendants have presented no evidence that any Facility or any hospital network manifested consent that the network would act as an agent on behalf of the Facility and under the Facility's control. As a result, Defendants' agency argument is unavailing at this stage of the litigation. *See Smock v. Brantley*, 76 N.C. App. 73, 75, 331 S.E.2d 714, 716 (1985) (citation omitted) (when there is no evidence tending to prove an agency relationship, the existence of agency is a question of law for the Court).

{32} In sum, despite ample opportunity to develop a more complete factual record, Defendants have failed to bring forward evidence that any of the Unlisted Facilities took "affirmative acts . . . to obtain the SafetySurveillor product." *Premier*, 232 N.C. App. at 610, 755 S.E.2d at 62. Because the Court of Appeals has concluded that "the Agreement requires some affirmative act by a Hospital Site to subscribe to or license the SafetySurveillor product in order for Product Implementation to occur," *id.*, Defendants cannot show that there was a Product Implementation at any Unlisted Facility. Because Earnout Payments are only due under the Agreement for a Product Implementation, the Court concludes that no

Earnout Payments are due for use of the SafetySurveillor product at any Unlisted Facility.

{33} Premier also seeks summary judgment on the basis that Defendants have failed to offer evidence showing that (i) any of the Unlisted Facilities met the definition of a "Hospital Site" under the Agreement and (ii) that any Unlisted Facility "completed any applicable implementation, configuration and testing of the product so that the product is ready for production use."[3] Defendants counter Premier's first argument by contending that "a simple google search of the locations listed by Dr. Peterson easily resolves" whether the "facilities constitute Hospital Sites." (Def. Br. Opp. Mot. Summ. J. 12 n.2). While the Court declines Defendants' invitation to perform over 1,000 Google searches, the Court is satisfied that Defendants have offered enough evidence, through Google search and otherwise, to create at least a genuine issue of material fact as to whether some or all of the Unlisted Facilities constitute "Hospital Sites" under the Agreement.

{34} As to Premier's second argument, however, the Court finds that Defendants have largely offered evidence and arguments that ineluctably rest on the theory expressly rejected by the Court of Appeals that receipt of an alert equates to an affirmative act and thus a Product Implementation. *Premier*, 232 N.C. App. at 607, 755 S.E.2d at 60 ("[T]he mere receipt of SafetySurveillor by a facility is, standing alone, insufficient to trigger an Earnout Payment under the Agreement."). As a result, the Court concludes that Premier's Motion should also be granted based on Defendants' failure to bring forward evidence that any Unlisted Facility "completed any applicable implementation, configuration and testing of the product so that the product is ready for production use" as required under the Agreement.

{35} Based on the above, the Court concludes that Premier is entitled to the entry of a declaratory judgment finding that Premier has not violated Defendants'

---

[3] The "Product Implementation" definition in the Agreement includes a Hospital Site that has "(B) completed any applicable implementation, configuration and testing of the product so that the product is ready for production use by the Hospital Site." (Agmt. § 2(b)(iii).)

rights to receive Earnout Payments under the Agreement for alleged Product Implementations at the Unlisted Facilities and that, as a result, dismissal of Defendants' counterclaims with prejudice is proper.

IV.

CONCLUSION

{36}  Accordingly, the Court hereby **GRANTS** Premier's Motion and **ORDERS** as follows:

    i.    Defendants' counterclaims for breach of contract, attorneys' fees, and recovery of audit expenses are hereby **DISMISSED** with prejudice.

    ii.    The Court hereby enters judgment for Premier on Premier's claim for declaratory judgment.

{37}  It is, therefore, **ORDERED**, **ADJUDGED**, and **DECREED** that Premier has not violated Defendants' rights to receive Earnout Payments under the Agreement for alleged Product Implementations at the Unlisted Facilities or otherwise violated any purported rights of Defendants as alleged by Defendants in this action.

**SO ORDERED**, this the 13th day of May, 2016.


/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases