IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-1122

Filed: 1 August 2017

Cumberland County, No. 06 CVS 6091

MITCHELL, BREWER, RICHARDSON, ADAMS, BURGE & BOUGHMAN; GLENN
B. ADAMS; HAROLD L. BOUGHMAN, JR. and VICKIE L. BURGE, Plaintiffs,

v.

COY E. BREWER, JR., RONNIE A. MITCHELL, WILLIAM O. RICHARDSON, and
CHARLES BRITTAIN, Defendants.[1]

Appeal by defendants from orders entered 26 February 2013, 18 September
2015, and 19 February 2016 by Judge John R. Jolly, Jr. in Cumberland County
Superior Court. Heard in the Court of Appeals 2 May 2017.

> *Everett Gaskins Hancock LLP, by E.D. Gaskins, Jr., James M. Hash and Fiona
> K. Steer, for plaintiffs-appellees.*
>
> *Ronnie M. Mitchell and Coy E. Brewer, Jr., pro se, for defendants-appellants.*

DAVIS, Judge.

This appeal involves a number of issues surrounding the break-up of the
Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC law firm. Upon
remand of the case following our resolution of the parties' initial appeal, the trial
court dissolved the law firm and appointed a referee to conduct an accounting and

---

[1] Richardson and Brittain have settled their disputes with Plaintiffs and are not parties to this
appeal.

distribution. Ronnie M. Mitchell[2] and Coy E. Brewer, Jr. (collectively "Defendants") now appeal from the trial court's orders appointing a referee, adopting the report of the referee, and granting the motion for summary judgment of Glenn B. Adams, Harold L. Boughman, Jr., and Vickie L. Burge (collectively "Plaintiffs") as to Defendants' remaining counterclaims. We affirm each of the trial court's orders.

## Factual and Procedural Background

The full factual background relating to the break-up of the firm is set out in our prior opinion. *See Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer*, 209 N.C. App. 369, 705 S.E.2d 757 (hereinafter "*Mitchell I*"), *disc. review denied*, 365 N.C. 188, 707 S.E.2d 243 (2011). Accordingly, we only discuss below those facts relevant to the present appeal.

This lawsuit arose out of a dispute between the members of the Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC law firm, which resulted in the firm breaking up in the summer of 2005.[3] Plaintiffs subsequently formed a new firm called Adams, Burge & Boughman, PLLC ("AB&B"), while Brewer, Mitchell, William O. Richardson, and Charles Brittain continued to practice law together as Mitchell, Brewer, Richardson. In the aftermath of the break-up, numerous

---

[2] The complaint and the captions of the trial court's orders incorrectly identify Mitchell as "Ronnie *A*. Mitchell" rather than "Ronnie *M*. Mitchell."

[3] For purposes of clarity, in this opinion we refer to the firm that existed at the time of dissolution — Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC — as "the PLLC."

disagreements arose between the parties regarding the ownership of certain PLLC assets — including future profits from unresolved contingent fee cases brought into the PLLC before the break-up.

On 5 July 2006, Plaintiffs filed the present lawsuit in Cumberland County Superior Court against Brewer, Mitchell, Richardson, and Brittain in which they asserted claims for (1) an accounting to the PLLC; (2) an accounting to Plaintiffs; (3) a "liquidating distribution"; (4) constructive fraud and breach of fiduciary duty; and (5) unfair and deceptive trade practices. In connection with these claims, Plaintiffs sought a judicial dissolution and winding up of the PLLC. Plaintiffs asserted these claims both individually and derivatively on behalf of the PLLC. Plaintiffs subsequently amended their complaint on 1 August 2006, 23 May 2007, and 17 February 2009.

The lawsuit was designated a complex business case pursuant to N.C. Gen. Stat. § 7A-45.4 and assigned to the Honorable John R. Jolly, Jr. of the North Carolina Business Court. On 1 November 2006, Defendants moved to dismiss Plaintiffs' complaint, and the trial court denied the motion by order entered on 8 May 2007. Defendants subsequently filed an answer on 13 June 2007, raising multiple defenses and asserting the following counterclaims: (1) a request for a declaratory judgment that Plaintiffs "voluntarily and unilaterally withdrew" from the PLLC; (2) a declaratory judgment that Plaintiffs were equitably estopped from denying that they

had agreed to a dissolution of the PLLC pursuant to the terms of a memorandum drafted by Brewer; (3) breach of fiduciary duty in connection with Plaintiffs' misuse of PLLC assets, failure to meet financial obligations of the PLLC, and failure to account for fees generated through PLLC business; (4) conversion and misappropriation of PLLC assets; (5) unjust enrichment for failure to account to the PLLC; (6) a request for imposition of a constructive trust, equitable lien, or resulting trust; (7) breach of fiduciary duty in connection with "the defense of [a] malpractice action[;]" (8) unjust enrichment in connection with "the defense of [a] malpractice action[;]" (9) breach of fiduciary duty based on *ultra vires* acts; and (10) a request for a statutory distribution of assets.

On 9 January 2008, the parties each filed motions for partial summary judgment. Plaintiffs' motion requested judicial dissolution of the PLLC and dismissal of Defendants' counterclaims that were "predicated on the proposition that no such dissolution occurred." Defendants' motion requested an order declaring that Plaintiffs had "withdrawn" from the PLLC as opposed to there having been a dissolution of the firm. On 15 August 2008, Defendants filed a second motion for summary judgment as to all of Plaintiffs' claims on the grounds that the PLLC lacked standing to bring this action on its own behalf and the individual plaintiffs lacked standing to bring this action derivatively on behalf of the PLLC.

The trial court issued an order on 31 March 2009 ruling, in part, that Plaintiffs were equitably estopped from denying that they had withdrawn from the PLLC. Therefore, the court held, all of the parties' claims would be evaluated in the context of a withdrawal by Plaintiffs from the PLLC rather than a dissolution of the PLLC. *Mitchell I*, 209 N.C. App. at 375-76, 705 S.E.2d at 762-63. All of the parties appealed to this Court from the trial court's order.

In *Mitchell I*, we affirmed in part the trial court's order, reversed in part, and remanded for further proceedings. With respect to the issue of standing, we held that Plaintiffs possessed standing under N.C. Gen. Stat. § 57C-8-01(a) to assert derivative claims on behalf of the PLLC. *Id.* at 382-87, 705 S.E.2d at 767-70. We further ruled that because "withdrawal pursuant to N.C. Gen. Stat. § 57C-5-06 was not available as a remedy at law for the parties[,]" the dismissal of Defendants' counterclaims premised upon an alleged withdrawal by Plaintiffs was proper. *Id.* at 390, 705 S.E.2d at 772. We also held that pursuant to N.C. Gen. Stat. § 57C-6-02 dissolution of the PLLC was necessary because there was a deadlock in its management. *Id.* at 390-91, 705 S.E.2d at 772.[4]

---

[4] We also rejected Defendants' allegation in Counterclaim Two that a memorandum drafted by Brewer (the "Brewer Memorandum") and provided to Plaintiffs on 8 July 2005 set forth the terms governing a dissolution of the PLLC. The Brewer Memorandum had sought to lay out the terms that would apply to the PLLC's break-up, including the distribution of certain PLLC assets and the handling of PLLC liabilities. In *Mitchell I*, we determined that Counterclaim Two failed because, among other reasons, there was no "indication that the plaintiffs expressly assented to the terms as proposed by defendants" in the Brewer Memorandum. *Id.* at 386, 705 S.E.2d at 769 (quotation marks omitted).

With respect to dissolution and the need for a liquidation and distribution, we explained as follows:

> Here, since 14 June 2005, there has been a deadlock between the PLLC members as a result of their disagreement regarding division of profits derived from pending contingent fee cases when three members of the PLLC left the PLLC, and plaintiffs and defendants began practicing separate and apart beginning on 1 July 2005. Although there were communications between plaintiffs and defendants addressing the assets of the PLLC, none resolved this deadlock. Because the three plaintiffs were no longer willing to practice with defendants, the PLLC could "no longer be conducted to the advantage of the members generally[.]" *See* [N.C. Gen. Stat. § 57C-6-02]. Liquidation of the PLLC's assets "is reasonably necessary for the protection of the rights or interests of the complaining member[s]" as the PLLC's members have been unable to reach any agreement regarding profits from the disputed pending contingent fee cases. *See id*. Also, there is evidence that profits made by defendants since the deadlock from one of the disputed contingent fee cases were not distributed to the members or accounted for by defendants. Therefore, there is a potential that the PLLC's assets are being misapplied. Accordingly, plaintiffs have forecast facts which would permit judicial dissolution pursuant to N.C. Gen. Stat. § 57C-6-02. As defendants had "a full and complete remedy at law[,]" the business court erred in not applying this legal remedy and instead applying the principles of equity to resolve the issues arising from this breakup.

*Id.*

Thus, we determined that "because the business court improperly applied equitable estoppel in this situation, it abused its discretion by not ordering judicial dissolution of the PLLC." *Id.* at 392, 705 S.E.2d at 773. We then concluded as follows:

Accordingly, we reverse the business court's judgment granting partial summary judgment in favor of defendants on the basis of equitable estoppel and remand to the business court for [the] granting of summary judgment in favor of plaintiffs on the issue of judicial dissolution pursuant [to] N.C. Gen. Stat. § 57C-6-02, for a decree of dissolution, and directing the winding up of the PLLC pursuant to N.C. Gen. Stat. § 57C-6-02.3 (2007). Given this ruling, plaintiffs' derivative claims for an accounting to the PLLC (claim one), an accounting to plaintiffs (claim two), and a demand of liquidating distribution (claim three), as well as defendants' counterclaim for a demand for statutory distribution of assets (counterclaim ten), will be addressed by the business court in its directing the winding up of the PLLC.

*Id.* at 393, 705 S.E.2d at 773. Finally, we reversed the trial court's dismissal of

Plaintiffs' Claims Four and Five and Defendants' Counterclaims Three through Six

and Nine on the ground that the trial court had dismissed those claims based upon

its incorrect determination that a withdrawal had occurred. *Id.* at 393, 705 S.E.2d at

773-74.

Upon remand, the trial court held a hearing on 17 August 2012 in order to

consider the parties' arguments regarding the potential appointment of a referee to

oversee accounting and distribution issues in connection with the dissolution of the

PLLC. Prior to the hearing, the parties submitted briefs setting forth their respective

positions regarding the appointment of a referee and the methodology that should be

employed in valuing disputed contingent fee engagements.

On 26 February 2013, the trial court issued an "Opinion and Order Dissolving Company and Appointing Special Master" (the "Reference Order").[5] In this order, the court entered a decree of dissolution retroactively dissolving the PLLC as of 1 July 2005 (the "Dissolution Date"). The trial court noted that "[t]he parties agree that a dissolution of the [PLLC] is required, as well as an accounting and distribution of its assets" but that "[t]he parties dispute various aspects of the financial and accounting records of the [PLLC] and the amounts owed by and to the respective parties." The court observed that "[a] primary point of contention between the parties is the appropriate accounting method for profits derived from the contingent-fee engagements that the [PLLC] entered into prior to dissolution but were resolved post-dissolution by Defendants ('Contingent Fee Engagements')." The court stated that

> [t]he difficulty in liquidating contingent-fee engagements by conventional means leads inevitably to the conclusion that the only way in which they may be converted to value following dissolution is by pursuing them to resolution. Further, it is unrealistic to suppose that all former members will collaborate in order to resolve contingent-fee engagements following dissolution. As is often the case in a law-firm setting, only a few of the members, perhaps only one, will have been involved personally in the engagement prior to dissolution and possess an adequate familiarity with the client and the subject matter of the litigation to proceed with representation following dissolution. Therefore, the task of pursuing such engagements following dissolution is likely to fall to those members who pursued the engagements prior to dissolution, usually at

---

[5] The parties and the trial court use the terms "referee" and "special master" interchangeably. For the sake of consistency, we will use the term "referee" as that is the term used in Rule 53 of the North Carolina Rules of Civil Procedure.

the affirmative direction of the client. Practically, this means that following dissolution an individual member or members will pursue the engagements using individual effort and skill without collaboration with former members.

The trial court then concluded that

the appropriate measure of the value of the Contingent Fee Engagements to the [PLLC] is the reasonable value of the services provided by or in behalf of the [PLLC] up to the date of dissolution. Under the present circumstances, the best means by which to measure the reasonable value of pre-dissolution services is to determine (a) the total attorney hours ("Time") expended on a particular Contingent Fee Engagement, both prior to and after dissolution, (b) the percentage of Time that was expended prior to dissolution and (c) the net profit ultimately realized from the Contingent Fee Engagement. The reasonable asset value to the [PLLC] of each such matter would be determined by the percentage of pre-dissolution Time expended relative to the net profit ultimately realized on that matter. As an example, if a total of 100 attorney hours were expended on a particular Contingent Fee Engagement and 50 of those hours were performed prior to dissolution, the net fee ultimately received by Defendants should be shared 50/50 with Plaintiffs. This method, as opposed to others, best accounts for the risk borne by the [PLLC] in initially taking on the Contingent Fee Engagements and also reflects the parties' expectations at the time they entered into the Contingent Fee Engagements.

The court therefore will direct the winding up of the [PLLC] in accordance with the findings and conclusions above. In doing so, the court observes that the reasoning relative to liquidation and sharing between the [PLLC] and Defendants of ultimate profits from Contingent Fee Engagements ordinarily also would hold true for any professional engagements ("Other Engagements") initially

undertaken by the [PLLC] but completed and billed for post-dissolution by Defendants. This Opinion and Order is intended to encompass such Other Engagements.

(Footnote omitted.)

The trial court proceeded to determine that the appointment of a referee "to conduct an accounting of the [PLLC] as to the Contingent Fee Engagements and any Other Engagements . . . will be in the best interest of the parties." Accordingly, the trial court ordered as follows:

> [31] The [PLLC] is DISSOLVED, pursuant to G.S. 57C-6-02. The dissolution of the [PLLC] shall be effective as of July 1, 2005 ("Dissolution Date").
>
> [32] The court appoints Craig A. Adams, CPA, as Special Master, pursuant to Rule 53. . . .
>
> [33] In undertaking and performing this engagement, the Special Master is authorized to engage the professional services of other members of his accounting firm, at their customary and usual hourly rates, as he reasonably determines are needed.
>
> [34] The Special Master shall take an account of the [PLLC] and the Defendants, consistent with the provisions of this Opinion and Order, and shall:
>
>> (a) Take control of and secure the financial records, or appropriate copies thereof, of the [PLLC];
>>
>> (b) Secure the financial records, or appropriate copies thereof, of the Defendants, as they relate to the Contingent Fee Engagements or any Other Engagements;
>>
>> (c) Assess the state of the financial records of

the [PLLC];

(d) Assess the state of the financial records of the Defendants as they relate to the Contingent Fee Engagements or any Other Engagements;

(e) Direct and assist in the preparation of financial statements that state the financial condition of the [PLLC] with reasonable accuracy;

(f) Investigate and report to the court the nature and extent of the outstanding assets and liabilities of the [PLLC];

(g) If there are [PLLC] assets subject to distribution under G.S. 57C-6-05, determine and recommend to the court the amount in which those assets should be distributed to the [PLLC] using generally accepted accounting principles and the protocols established in this Opinion and Order;

(h) With regard to any [PLLC] assets available for distribution, determine and recommend to the court the manner and proportions of such distributions to the various members of the [PLLC] as of the date of dissolution; and

(i) The [PLLC] shall submit to the Special Master records of all attorney billable hours expended prior to the Dissolution Date on any matter pending as of the Dissolution Date. This record shall indicate the number of total billable hours attributable to the Contingent Fee Engagements or any Other Engagements. Defendants shall submit to the Special Master a record of all attorney hours expended on the Contingent Fee Engagements or any Other Engagements.

[35] All parties to this civil action shall cooperate

fully with the Special Master in the performance of his duties.

[36] The Special Master shall report his finding to the court as soon as practicable and may request from the parties or the court any further information, authority, direction or actions he might need from the court or parties in order to perform the duties reflected in this Opinion and Order.

. . . .

[38] All parties to this civil action are directed to cooperate with the Special Master and provide any and all financial information and records he might request.

[39] During [the] pendency of this civil action or unless otherwise ordered, all parties are directed not to destroy, remove, alter or obscure any of the financial or otherwise relevant records of the [PLLC].

None of the parties filed objections to the Reference Order or to the appointment of the Referee as provided for therein. The trial court subsequently issued an order on 14 June 2013 providing additional specificity regarding the materials that the parties were required to make available to the Referee. During the course of the accounting process, the Referee conducted *ex parte* interviews with the parties in order to better understand the records that had been submitted to him. On 24 October 2014, after the Referee had completed his report but before it was filed with the trial court, the parties were allowed to depose Sarah Armstrong — senior manager for the Referee's accounting firm and the report's principal author — regarding the accounting process and methodology that had been used.

The Referee subsequently filed his report (the "Referee's Report") with the trial court on 13 February 2015. The report had "three primary areas of focus: profit allocation percentages; restoration of negative capital accounts; and allocation of contingent fees." After explaining its determinations with respect to each of these issues, the Referee ultimately concluded that Defendants owed a total of $358,000 to Plaintiffs — specifically, $109,000 to Adams, $96,000 to Boughman, and $153,000 to Burge.

On 13 March 2015, Brewer, Mitchell, and Brittain filed "Exceptions and Objections Regarding Report of Special Master." Among other things, they argued that the trial court's prior orders related to the Referee "did not and do not clearly define the methodology to be employed and the scope of the responsibilities and powers of the appointed referee or special master." They also requested that certain findings in the Referee's Report be submitted to a jury.

Plaintiffs subsequently filed a motion requesting that the trial court adopt the Referee's Report. Following a hearing on 8 May 2015, the trial court issued its "Opinion, Order and Judgment" (the "Adoption Order") on 18 September 2015 granting Plaintiffs' motion to adopt the Referee's Report and rejecting the objections raised by Brewer, Mitchell, and Brittain.[6]

---

[6] By the time the Adoption Order was filed, only Mitchell and Brewer remained as defendants.

In the Adoption Order, the trial court determined that by failing to object at the time the Reference Order was issued, Defendants had waived their right to (1) demand a jury trial on contested issues addressed in the Reference Order; and (2) argue that the Reference Order failed to clearly define the methodology to be employed by the Referee and the scope of his responsibilities and powers. The court also rejected Defendants' various exceptions to the substantive findings of the report.

The trial court ultimately concluded that "the Referee's Report complies with the Reference Order, is supported by competent evidence and that the conclusions reached in the Referee's Report are supported by the facts found." Accordingly, the trial court adopted the Referee's Report "in its entirety as constituting the findings and conclusions of the court" and entered judgments against Defendants in the amount of $102,578 each.

The trial court then explained that its ruling did "not constitute a final disposition of this civil action, as there remain unresolved claims and counterclaims." The court therefore ordered the parties to file by 12 October 2015 any dispositive motions related to those unresolved claims — namely, Plaintiffs' Claims Four and Five and Defendants' Counterclaims Three through Nine.

On that date, Plaintiffs filed a motion for summary judgment as to Defendants' remaining counterclaims. In support of this motion, Plaintiffs relied upon our decision in *Mitchell I* as well as the trial court's Adoption Order and the Referee's

Report. Defendants submitted affidavits from Mitchell and Brewer in opposition to Plaintiffs' motion and also filed a cross-motion for summary judgment as to Plaintiffs' claims for fraud and breach of fiduciary duty (Claim Four) and unfair and deceptive trade practices (Claim Five). On 9 December 2015, Plaintiffs voluntarily dismissed Claims Four and Five, thereby mooting Defendants' summary judgment motion.

On 19 February 2016, the trial court issued an "Order and Opinion" (the "Final Order") granting Plaintiffs' motion for summary judgment and dismissing all of Defendants' remaining counterclaims. Defendants filed a timely notice of appeal to this Court as to the Reference Order, the Adoption Order, and the Final Order.

**Analysis**

Defendants' arguments on appeal fall into two main categories: (1) challenges related to the appointment of the Referee, the accounting process utilized by the Referee, and the trial court's adoption of the Referee's Report; and (2) challenges to the trial court's entry of summary judgment in Plaintiffs' favor on Defendants' Counterclaims Three through Six and Nine.[7] We address each set of arguments in turn.[8]

---

[7] Defendants do not appeal the trial court's dismissal of Counterclaims Seven and Eight, which the court dismissed because Defendants' brief in opposition to Plaintiffs' motion for summary judgment neither addressed them nor pointed to evidence that would create a genuine issue of material fact as to them.

[8] Defendants do not raise on appeal any of the substantive exceptions that they asserted below to the findings in the Referee's Report. Accordingly, those exceptions are waived. *See* N.C. R. App. P.

## I. Issues Related to Referee's Report

In addition to challenging the initial decision to appoint a referee, Defendants also argue on appeal that the trial court "failed to define clearly the methodology to be employed and the scope of the responsibilities and powers of the appointed referee . . . or the means for consideration of the issues in the case." Relatedly, they challenge the manner in which the Referee conducted the accounting, including his decisions not to place interviewees under oath or to compile transcripts of their interviews as well as his use of *ex parte* communications with the various parties.

In order to assess these arguments, we begin with an overview of the procedure by which a trial court may refer matters to a referee. Pursuant to Rule 53 of the North Carolina Rules of Civil Procedure, "(1) upon consent of the parties, (2) upon application of one of the parties, or (3) upon its own motion, a trial court may order that a referee determine issues of fact raised by the pleadings and evidence." *Rushing v. Aldridge*, 214 N.C. App. 23, 24, 713 S.E.2d 566, 568 (2011) (citation omitted). If one of the parties does not consent, the court may order a reference in the following instances:

> a. Where the trial of an issue requires the examination of a long or complicated account; in which case the referee may be directed to hear and decide the whole issue, or to report upon any specific question of fact involved therein.

---

28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."); *Larsen v. Black Diamond French Truffles, Inc.*, 241 N.C. App. 74, 79, 772 S.E.2d 93, 96 (2015) ("[U]nder Rule 28(b)(6) of the North Carolina Rules of Appellate Procedure, where a party fails to assert a claim in its principal brief, it abandons that issue . . . .").

b.  Where the taking of an account is necessary for the information of the court before judgment, or for carrying a judgment or order into effect.

c.  Where the case involves a complicated question of boundary, or requires a personal view of the premises.

d.  Where a question of fact arises outside the pleadings, upon motion or otherwise, at any stage of the action.

N.C. R. Civ. P. 53(a)(2).

A trial court's decision to order a "compulsory reference in an action which the court has authority to refer is a matter within the sound discretion of the court." *Dockery v. Hocutt*, 357 N.C. 210, 215, 581 S.E.2d 431, 434 (2003).  When a reference is made, "[t]he duty and powers of the referee are not inherent but are determined by the order of the judge."  *Godwin v. Clark, Godwin, Harris & Li, P.A.*, 40 N.C. App. 710, 713, 253 S.E.2d 598, 601 (citation omitted), *appeal dismissed*, 297 N.C. 698, 259 S.E.2d 295 (1979).

After gathering the relevant facts, "[t]he referee shall prepare a report upon the matters submitted to him by the order of reference and shall include therein his decision on all matters so submitted."  N.C. R. Civ. P. 53(g)(1).  After hearing any exceptions to the referee's report lodged by the parties, the court "may adopt, modify or reject the report in whole or in part, render judgment, or may remand the proceedings to the referee with instructions."  N.C. R. Civ. P. 53(g)(2).

If a reference is compulsory, a party may preserve its right to a jury trial on issues decided by the referee by taking each of the following steps:

> a. Objecting to the order of compulsory reference *at the time it is made*, and
>
> b. By filing specific exceptions to particular findings of fact made by the referee within 30 days after the referee files his report with the clerk of the court in which the action is pending, and
>
> c. By formulating appropriate issues based upon the exceptions taken and demanding a jury trial upon such issues. Such issues shall be tendered at the same time the exceptions to the referee's report are filed. If there is a trial by jury upon any issue referred, the trial shall be only upon the evidence taken before the referee.

N.C. R. Civ. P. 53(b)(2) (emphasis added). If these requirements are satisfied, "[t]he objecting party will then be entitled to a jury trial on the specified issues unless the evidence presented to the referee would entitle one of the parties to a directed verdict." *Rushing*, 214 N.C. App. at 26, 713 S.E.2d at 569 (citation omitted).

As an initial matter, Defendants have not preserved their right to have a jury decide any matters determined by the Referee as they failed to "[o]bject[ ] to the order of compulsory reference at the time it [was] made[.]"[9] N.C. R. Civ. P. 53(b)(2)(a); *see also Gaynor v. Melvin*, 155 N.C. App. 618, 621, 573 S.E.2d 763, 765 (2002) ("In order

---

[9] Defendants point to a footnote contained in Mitchell's 15 August 2012 submission to the trial court — over six months *before* the 26 February 2013 Reference Order was issued — stating that he did "not desire or consent to the entry of an order of reference . . . ." We do not believe, however, that this preliminary objection to the potential appointment of a referee satisfied Rule 53 as it was not raised *at the time the reference was made* as required by Rule 53(b)(2)(a).

to preserve the right to a jury trial where a compulsory reference has been ordered, a party must, among other things, object to the order of reference at the time it is made.").

Our decision in *Godwin* is instructive in addressing Defendants' arguments — both procedurally and substantively. In *Godwin*, the plaintiff contended on appeal that "the trial court and referee did not comply with the terms of Rule 53 in that [the] referee did not conduct hearings, examine witnesses under oath, admit exhibits into evidence, prepare a record, make definite findings of fact and conduct an audit before making the valuation." *Godwin*, 40 N.C. App. at 713-14, 253 S.E.2d at 601. This Court rejected these contentions on several grounds. With regard to the plaintiff's substantive arguments, we held that "[n]one of these procedures are required under the statute" and noted that "[t]he trial court order did not require any of these procedures." *Id.* at 714, 253 S.E.2d at 601.

With regard to the issue of whether the plaintiff had properly preserved its right to challenge the procedures set forth in the reference order, we stated that "[a]t the time the order for a compulsory reference was entered, plaintiff did not object to the contents of the order. Plaintiff cannot now complain." *Id.* Similarly, we noted that "[d]uring the proceedings before the referee, plaintiff did not object at any time to the procedures used." *Id.*

Here, we similarly reject as untimely Defendants' challenges to the scope of the Reference Order or the manner in which the Referee carried out his duties. At no point during the two years between the issuance of the Reference Order and the filing of the Referee's Report did Defendants formally object to the scope of the Reference Order or the process by which the Referee was conducting the accounting. The first time Defendants raised any such objections on the record was on 13 March 2015 in their Exceptions and Objections Regarding Report of Special Master.

It is important to note that Defendants do not contend that they were unaware of how the Referee was conducting the accounting while the process was ongoing. Nevertheless, they waited until *after* the Referee's Report was issued to object to the procedures utilized by the Referee.[10] Accordingly, Defendants' challenges to the scope of the Reference Order and the procedures employed by the Referee have been waived.

Moreover, Defendants' arguments fail substantively as well. Our holding in *Godwin* demonstrates that Rule 53 provides few hard-and-fast rules governing the manner in which an accounting must be conducted as well as the fact that trial courts possess broad discretion in determining how a referee is to fulfill his duties:

> Plaintiff maintains that the trial court and referee did not
> comply with the terms of Rule 53 in that [the] referee did
> not conduct hearings, examine witnesses under oath,

---

[10] In addition, we observe that some of Defendants' specific arguments on appeal — such as those relating to the Referee's use of *ex parte* communications and the lack of interview transcripts — were not even raised in their Exceptions and Objections Regarding Report of Special Master.

> admit exhibits into evidence, prepare a record, make definite findings of fact and conduct an audit before making the valuation. *None of these procedures are required under the statute. The trial court order did not require any of these procedures.*

*Godwin*, 40 N.C. App. at 713-14, 253 S.E.2d at 601 (emphasis added).

Moreover, Rule 53 provides that a referee conducting an accounting has significant discretion regarding how he obtains financial information:

> When matters of accounting are in issue before the referee, he may prescribe the form in which the accounts shall be submitted . . . . [U]pon a showing that the form of statement is insufficient, the referee may require a different form of statement to be furnished, or the accounts of specific items thereof to be proved by oral examination of the accounting parties or upon written interrogatories or in such other manner as he directs.

N.C. R. Civ. P. 53(f)(2).[11]

We are not persuaded by Defendants' citation to *Synco, Inc. v. Headen*, 47 N.C. App. 109, 266 S.E.2d 715, *disc. review denied*, 301 N.C. 238, 283 S.E.2d 135 (1980), to support their argument that the Referee's failure to require sworn testimony and produce transcripts of his interviews was improper. In *Synco*, the trial court appointed a referee to resolve a lawsuit involving a large number of individual transactions between the parties related to repairs made to several apartment complexes. *Id.* at 112, 266 S.E.2d at 717. The referee engaged the services of a court

---

[11] Indeed, Defendants acknowledge in their brief that "Rule 53 does not always require that the referee conduct a hearing, examine witnesses, receive evidence, or make findings of fact unless the order of reference so directs[.]"

reporter who recorded nine days of witness testimony before the referee. However, transcripts of the testimony were never actually prepared and entered into the record. After the referee issued his report, the defendants filed an exception regarding the lack of transcripts. *Id.* at 114, 266 S.E.2d at 718.

On appeal, the defendants argued that the trial court had erred in adopting the referee's report without the production of transcripts. In our decision, we cited Rule 53(f)(3), which provides that "[t]he testimony of all witnesses must be reduced to writing by the referee, or by someone acting under his direction and shall be filed in the cause and constitute a part of the record." *Id.* at 113, 266 S.E.2d at 718. We noted that "[t]he transcript requirement of Rule 53 may, however, be waived by agreement of the parties." *Id.* at 114, 266 S.E.2d at 718. We then held that because the defendants had raised the transcript issue in their exceptions to the referee's report, the issue was preserved. We therefore reversed on this ground. *Id.* at 113-14, 266 S.E.2d at 718.

*Synco* is distinguishable on its face. That case involved nine days of testimony before a referee that the parties and the trial court fully expected to be transcribed, yet no transcripts were ever provided by the court reporter. *Id.* at 113, 266 S.E.2d at 717. Here, conversely, the trial court did not direct — and the parties did not expressly request — that the Referee take sworn testimony from witnesses. Thus,

the Referee possessed the authority to conduct the accounting process in the manner he believed would be most efficient.

In short, neither Rule 53 nor the Reference Order mandated that the Referee conduct the accounting process in the manner that Defendants are now arguing was required. Accordingly, for all of the reasons set out above, we are unable to conclude that Defendants have demonstrated legal error with regard to the trial court's appointment of the Referee, the court's articulation of the scope of the Referee's duties, the manner in which the Referee carried out those duties, or the trial court's adoption of the Referee's Report. Therefore, we affirm both the Reference Order and the Adoption Order.

## II. Entry of Summary Judgment as to Defendants' Counterclaims

Defendants' final argument is that the trial court erred in granting summary judgment in favor of Plaintiffs on Counterclaims Three through Six and Nine. "On an appeal from an order granting summary judgment, this Court reviews the trial court's decision *de novo*. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Premier, Inc. v. Peterson*, 232 N.C. App. 601, 605, 755 S.E.2d 56, 59 (2014) (internal citations and quotation marks omitted).

It is well established that "[t]he moving party has the burden of demonstrating the lack of any triable issue of fact and entitlement to judgment as a matter of law. The evidence produced by the parties is viewed in the light most favorable to the non-moving party." *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009) (internal citations omitted). We have held that "[a]n issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *In re Alessandrini*, 239 N.C. App. 313, 315, 769 S.E.2d 214, 216 (2015) (citation omitted).

We agree with the trial court that Counterclaims Three through Six and Nine fail as a matter of law. Defendants' answer contained the following prefatory language introducing these counterclaims:

> If it is determined that the individual Plaintiffs did not withdraw [from] the [PLLC] and there was no dissolution upon the terms set forth in the July 8, 2005 Memorandum, *then there has been no dissolution of the [PLLC]* because none of the requirement[s] in G.S. § 57C-6-01 have been met. *In the event the individual Plaintiffs are still members of the [PLLC]*, then Defendant alleges the following claims in the alternative[.]

(Emphasis added.)

Similarly, Counterclaims Three through Six and Nine each individually asserted that "[i]f it is determined that the individual Plaintiffs have not withdrawn from the [PLLC], *the individual Plaintiffs are still members of the [PLLC]* and still owe a fiduciary duty to the [PLLC] and to the Defendants . . . ." (Emphasis added.)

- 24 -

Thus, each of the counterclaims at issue in this appeal were — by their express terms — premised upon the incorrect proposition that dissolution of the PLLC was not required and that the PLLC, therefore, remained an ongoing entity.[12] Critically, none of these counterclaims were based upon the correct theory — that a judicial dissolution was necessary because of the deadlock between the PLLC's members. This mistaken assumption that the PLLC remained in existence was further reflected in the substantive allegations contained within each of these counterclaims.

Counterclaim Three ("Breach of Fiduciary Duty") alleged that

> [t]he individual Plaintiffs have breached their fiduciary duties to the [PLLC] and to the Defendants by, among other things, failing to meet their financial obligations to the [PLLC] through payment of a portion of the [PLLC]'s expenses and liabilities, failing to account for the legal fees they have generated on legal matters after they ceased practicing law with the [PLLC], and failing to pay to the [PLLC] and/or to the Defendants a share of such legal fees.

Counterclaim Four ("Conversion/Misappropriation of Firm Assets") asserted that

> [t]he individual Plaintiffs have wrongfully converted and/or misappropriated assets of the [PLLC] by, among other things, failing to pay to the [PLLC] or to the Defendants their share of the [PLLC]'s expenses or liabilities and by failing to pay to the [PLLC] or to the Defendants a portion of the legal fees the individual Plaintiffs and/or AB&B generated from legal matters after

---

[12] The only counterclaim that was premised upon a dissolution theory was Counterclaim Two, which was based upon the notion that the PLLC had dissolved *in accordance with the terms of the Brewer Memorandum.* As discussed above, however, *Mitchell I* foreclosed Defendants' reliance upon that theory.

they ceased practicing law with the [PLLC].

Counterclaim Five ("Unjust Enrichment") alleged that

> [t]he individual Plaintiffs and/or AB&B have been unjustly enriched by failing to pay their share of the [PLLC]'s expenses and liabilities and by failing to pay to the [PLLC] or to the Defendants a portion of the legal fees the individual Plaintiffs and/or [sic] generated on legal matters after the individual Plaintiffs[ ] ceased practicing law with the [PLLC].

Counterclaim Six ("Constructive Trust, Equitable Lien, and/or Resulting Trust") asserted that

> Defendants and the [PLLC] are entitled to a constructive trust, an equitable lien, and/or a resulting trust upon any and all fees, deposits, or property acquired by the individual [Plaintiffs] and/or AB&B for the individual Plaintiffs' share of the [PLLC]'s expenses and liabilities and for Defendants' share of the legal fees the individual Plaintiffs generated from legal matters after they ceased practicing law with the [PLLC].

Finally, Counterclaim Nine (Breach of Fiduciary Duty/*Ultra Vires* Act) alleged that

> [a]fter the individual [Plaintiffs] withdrew from the [PLLC], they filed a legal action against the Defendants without making any reasonable inquiry or investigation to determine whether the [PLLC] had dissolved, whether Defendants and/or the [PLLC] had commingled assets or whether there was any factual basis for their legal claims.
>
> 121. Had the individual Plaintiffs conducted such a reasonably [sic] inquiry or investigation, they would have determined the [PLLC] has not dissolved, that there had been no commingling of [PLLC] assets, and that there was

no basis for individual Plaintiffs['] legal claims against Defendants.

Accordingly, it is clear that Counterclaims Three through Six and Nine were premised upon neither a withdrawal *nor* a dissolution having occurred. Rather, the essence of these counterclaims was that Plaintiffs were required to pay their share of the PLLC's ongoing debts and liabilities based upon their continuing status as members of the PLLC and to account for legal fees received by them since their dispute with Defendants had occurred. However, such a legal theory is inconsistent with our ruling in *Mitchell I* in which we held that a judicial dissolution was necessary. In accordance with our decision, the trial court ordered that the PLLC be dissolved as of 1 July 2005.

Thus, any confusion that may have existed between the parties as to the status of the PLLC was eliminated by our decision in *Mitchell I*. Nevertheless, Defendants failed to amend their counterclaims in the aftermath of *Mitchell I* to reflect the reality that the PLLC had been judicially dissolved and to reframe their claims for relief accordingly.[13]

---

[13] Nor does the fact that *Mitchell I* reversed the trial court's dismissal of Counterclaims Three through Six and Nine mean that those claims are currently viable. Our ruling in *Mitchell I* on this issue was based upon the fact that the trial court had improperly dismissed those counterclaims pursuant to its legally incorrect ruling that a withdrawal had occurred based upon principles of equitable estoppel. We therefore reversed the trial court's dismissal of these counterclaims because of this error of law. The issue of whether Counterclaims Three through Six and Nine — as pled — would survive a subsequent order of dissolution by the trial court was not before us.

Moreover, it is important to note that despite the above-referenced defects with respect to Counterclaims Three through Six and Nine, Defendants nevertheless had a full and fair opportunity during the accounting process to seek all sums that they claimed they were owed and to raise any issues that they felt needed to be addressed in the accounting. Additionally, the Referee's Report largely encompassed the matters raised in these counterclaims, including the accounting of legal fees connected to matters that had originated with the PLLC but were later resolved by the various parties after the break-up.

The Referee's Report focused on three primary areas: "[1] profit allocation percentages; [2] restoration of negative capital accounts; and [3] allocation of contingent fees[,]" which it rightly determined were "the most relevant and significant financial components of a settlement between the Parties." With respect to this last category — which has been the principal source of disagreement over the course of this litigation — the report contained an extensive analysis of the values of contingent fee cases that had been received before dissolution but resolved afterward. Significantly, this analysis encompassed cases that were resolved following the break-up by both Defendants and Plaintiffs.

Thus, the Referee's Report contained a thorough and detailed accounting in connection with the dissolution of the PLLC. The Defendants had an opportunity prior to the completion of the accounting to request that the Referee consider

additional financial matters related to the PLLC, but they did not do so. Moreover, Defendants have not challenged on appeal the substance of the Referee's Report. Therefore, any issues concerning the validity of the Referee's substantive findings are not before us.

## Conclusion

For the reasons stated above, we affirm the trial court's orders of 26 February 2013, 18 September 2015, and 19 February 2016.

AFFIRMED.

Judges BRYANT and STROUD concur.