IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-1139

Filed: 5 September 2017

Mecklenburg County, No. 11 CVS 1054

PREMIER, INC., Plaintiff,

v.

DAN PETERSON; OPTUM COMPUTING SOLUTIONS, INC.; HITSCHLER-CERA, LLC; DONALD BAUMAN; MICHAEL HELD; THE HELD FAMILY LIMITED PARTNERSHIP; ROBERT WAGNER; ALEK BEYNENSON; I-GRANT INVESTMENTS, LLC; JAMES MUNTER; GAIL SHENK; STEVEN E. DAVIS; CHARLES W. LEONARD, III; AND JOHN DOES 1-10, Defendants.

Appeal by Defendants from order entered 13 May 2016 by Judge Louis A. Bledsoe, III in Mecklenburg County Special Superior Court for Complex Business Cases. Heard in the Court of Appeals 23 March 2017.

*Moore & Van Allen PLLC, by J. Mark Wilson and Kathryn G. Cole, for Plaintiff-Appellee.*

*The Spence Law Firm, LLC, by Mel C. Orchard, III, and Tin, Fulton, Walker & Owen, PLLC, by Sam McGee, for Defendants-Appellants.*

MURPHY, Judge.

Dr. Dan Peterson ("Dr. Peterson"); Optum Computing Solutions, Inc.; Hitschler-Cera, LLC; Donald Bauman; Michael Held; The Held Family Limited Partnership; Robert Wagner; Alek Beynenson; I-Grant Investments, LLC; James

Munter; Gail Shenk; Steven E. Davis; Charles W. Leonard, III; and John Does 1-10[1] (collectively "Defendants") appeal from an Order and Opinion granting Premier, Inc.'s ("Premier") motion for summary judgment; dismissing with prejudice Defendants' counterclaims for breach of contract, attorneys' fees, and recovery of audit expenses; and entering judgment for Premier on its claim for declaratory judgment upon determining that Premier had not violated Defendants' rights to receive annual earnout payments (the "Earnout Amount") under their Stock Purchase Agreement (the "Agreement"). After careful review, we affirm the trial court's decision.

## Background

This is Defendants' second appeal in this case. Although a full recitation of the first appeal's facts and procedural history may be found in *Premier, Inc. v. Peterson*, 232 N.C. App. 601, 755 S.E.2d 56 (2014) ("*Premier, Inc. I*"), we limit our discussion in this opinion to the facts and procedural history relevant to the issues currently before us.

On 29 September 2006, Premier acquired stock in Cereplex, Inc. ("Cereplex") by entering into a Stock Purchase Agreement with Defendants, former shareholders and stakeholders of Cereplex, under which Defendants were entitled to receive an annual Earnout Amount from Premier for five years after the date of the Agreement. Cereplex had developed software products, Setnet and PharmWatch, that provided web-based surveillance and analytic services for healthcare providers. After

[1] The record contains a number of different names and spellings for certain individual defendants. However, pursuant to court practice, we use the above names and spellings listed on the order from which appeal is taken.

- 2 -

acquiring shares of Cereplex, Premier developed SafetySurveillor, a successor product that combined the functionalities of Setnet and PharmWatch into one software program which generates automated alerts to notify its users of health-related problems that require attention.

Pursuant to the Agreement, the annual Earnout Amount to which Defendants are entitled is calculated as "$12,500 for each Hospital Site where a Product Implementation occurs during the applicable 12-month period; excluding the first fifty (50) Hospital Sites where a Product Implementation occurs[.]" There has been "Product Implementation" when:

> a Hospital Site . . . has (A) *subscribed to or licensed* the Company's Setnet or PharmWatch product (or any derivative thereof, successor product, or new product that substantially replaces the functionality of either product), whether such product is provided, sold, or licensed (for a charge or at no charge, or provided on a stand-alone basis or bundled with other products and/or services) to the applicable Hospital Site by Company (or its successor in interest), any affiliate of the Company or any reseller authorized by the Company, *and (B) completed any applicable implementation, configuration and testing* of the product so that the product is ready for production use by the Hospital Site.

(Emphasis added and omitted).

Following an audit of Premier's records, Defendants accused Premier of failing to report or include in the Earnout Amount certain Hospital Sites where there was

Product Implementation. Specifically, Defendants alleged that single-event alerts[2] that were reported in the audit were indicative of Product Implementation. Ultimately, the audit indicated that SafetySurveillor software was utilized by over 1,000 Hospital Sites. However, Premier only recognized 263 Hospital Sites for purposes of the Product Implementation provision of the Agreement. Accordingly, Defendants informed Premier that they intended to sue for miscalculating the Earnout Amount to which Defendants were entitled and violating the terms of the Agreement.

On 19 January 2011, Premier preemptively filed an action in Mecklenburg County Superior Court seeking declaratory judgment that it had not breached the Agreement.[3] On 27 April 2011, Defendants filed an answer and counterclaims, alleging breach of contract and seeking recovery of damages, audit expenses, and attorneys' fees. On 30 August 2011, Premier filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure, or, alternatively, a motion for summary judgment pursuant to Rule 56. On 11 December 2012, the trial court entered an Order and Opinion granting summary judgment in favor of Premier on its declaratory judgment claim as well as Defendants' counterclaims.

---

[2] A single-event alert refers to the notification the SafetySurveillor program sends to designated medical personnel to identify either (1) the potential presence of an infection that a patient acquired during their course of treatment in a healthcare facility or setting; or (2) a possible problem with the antibiotic therapy prescribed to a patient.

[3] This matter was designated as a mandatory complex business case by the Chief Justice of the Supreme Court of North Carolina on 19 January 2011.

### i.  Premier, Inc. I

Defendants timely appealed the 11 December 2012 Order and Opinion. In the original appeal, Premier claimed that "for Product Implementation to occur, a Hospital Site must affirmatively take steps to subscribe to or license the SafetySurveillor" software, and that mere receipt of the product was not enough. *Premier, Inc. I*, 232 N.C. App. at 606, 755 S.E.2d at 60. Based on this assertion, Premier argued it had fully satisfied its obligations under the Agreement as it had made Earnout Amount payments for all of the Hospital Sites with which it had formal written subscription agreements, not including the first 50 Hospital Sites where Product Implementation occurred as allowed under the Agreement. *Id.* at 606, 755 S.E.2d at 60.

Conversely, Defendants asserted that the "subscribed to or licensed" component of Product Implementation is satisfied when Premier simply *provides* SafetySurveillor to a facility, a fact which would be evinced by the alerts fired from those facilities. *Id.* at 606, 755 S.E.2d at 60. Therefore, Defendants maintained "that Premier was not entitled to summary judgment because the . . . audit . . . indicated that Premier . . . 'provided' the SafetySurveillor program to over 1,000" Hospital Sites, which necessarily constitutes Product Implementation. *Id.* at 606, 755 S.E.2d at 60.

On 4 March 2014, we vacated the trial court's 11 December 2012 Order and Opinion and remanded the case for further proceedings. *Id.* at 610, 755 S.E.2d at 62. In doing so, we agreed with Premier and held that "the unmistakable meaning of the language the parties agreed upon in drafting the Agreement is that some affirmative

act on the part of the Hospital Site is required" to show Product Implementation, and that mere provision of the software to Hospital Sites without more is insufficient. *Id.* at 607, 755 S.E.2d at 60. To conclude otherwise would be to read out of the Agreement the phrase "subscribed to or licensed." *Id.* at 607, 755 S.E.2d at 60.

However, we also recognized that the Agreement does not specifically require a formal written agreement. *Id.* at 609-10, 755 S.E.2d at 62. In that respect, although the firing of an alert is not dispositive, it is probative of the issue of Product Implementation. *Id.* at 609, 755 S.E.2d at 61. Simply put, we held that "the Agreement contemplates a mutual arrangement between Premier and the Hospital Site whereby Premier *agrees* to provide the SafetySurveillor product and the Hospital Site *agrees* to accept it and utilize its services." *Id.* at 608, 755 S.E.2d at 61 (emphasis added).

Pertinent to the instant appeal, we also concluded that interpreting the Agreement in this way did not resolve the case. *Id.* at 608, 755 S.E.2d at 60-61. Specifically, we held that "[w]hile we do not foreclose the possibility that summary judgment may ultimately be appropriate in this matter, we believe that such a determination cannot properly be made at the present time in light of the incomplete factual record that currently exists[,]" and therefore we remanded the case to the trial court for a fuller development of the factual record. *Id.* at 610, 755 S.E.2d at 62 (citation omitted). Further factual development was necessary to explore what affirmative acts, if any, were taken by the disputed Hospital Sites to obtain the SafetySurveillor product so that any such acts could be evaluated in accordance with

our interpretation of the "subscribed to or licensed" language in the Agreement. *Id.* at 610, 755 S.E.2d at 62. Mandate issued on 24 March 2014.

## ii. Case Activity on Remand

On remand, the parties submitted a joint Case Management Report in which they agreed that fact discovery would consist of two phases – fact witness depositions followed by written discovery. On 30 June 2014, the trial court entered an Amended Case Management Order that established the parties would have through 1 November 2014 to conduct fact discovery as contemplated by the Case Management Report.

On 31 October 2014, one day before the discovery deadline and 221 days after remand from this court, Defendants served their first set of interrogatories and requests for production of documents. On 21 November 2014, Premier filed a motion for protective order arguing that Defendants' discovery requests were untimely under Rule 18.8 of the North Carolina Business Court's General Rules of Practice and Procedure as they could not be answered within the trial court's deadline. However, the trial court, giving great deference to this Court's directive to develop more fully the factual record, ordered Premier to serve responses to Defendants' discovery requests. The parties subsequently engaged in written discovery and related document production to retrieve evidence of the requisite affirmative acts. Defendants did not conduct third party discovery, did not issue a single subpoena, nor did they produce evidence relating to interactions between Premier and the Hospital Sites in contention, or, as we noted in *Premier, Inc. I*, evidence of

"affirmative acts [ ] taken by the facilities identified by Defendants to obtain the SafetySurveillor product[.]" *Id.* at 610, 755 S.E.2d at 62.

On 1 December 2015, Premier filed a motion for summary judgment which was heard on 26 February 2016. On 13 May 2016, the trial court granted Premier's motion for summary judgment, dismissed with prejudice Defendants' counterclaims, and entered judgment in Premier's favor on its claim for declaratory judgment. In doing so, the trial court observed:

> [D]espite ample opportunity to develop a more complete factual record, Defendants have failed to bring forward evidence that any of the [Hospital Sites] took "affirmative acts . . . to obtain the SafetySurveillor product." [*Id.*] at 610, 755 S.E.2d at 62. Because the Court of Appeals has concluded that "the Agreement requires some affirmative act by a Hospital Site to subscribe to or license the SafetySurveillor product in order for Product Implementation to occur," *id.* [at 610, 755 S.E.2d at 62], Defendants cannot show that there was a Product Implementation at any [Hospital Site].

Defendants timely appealed to this Court.

## Analysis

As the parties' depositions, affidavits, and other documents were filed under seal, the depth of our discussion and analysis in this opinion is somewhat limited; however, our review was exhaustive and we considered all of the documents and testimony under seal. *See e.g. Radiator Specialty Co. v. Arrowood Indemnity Co.*, ___ N.C. App. ___, ___, 800 S.E.2d 452, 456 (2017) (explaining the court's discussion and analysis is limited where the documents in the record were filed under seal).

The issue on appeal is whether Plaintiffs have forecast any evidence which would create a genuine issue of material fact that the Hospital Sites took affirmative acts as outlined in *Premier, Inc. I* to "subscribe to" or "license" SafetySurveillor. "Our standard of review of an appeal from summary judgment is de novo[.]" *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation omitted). The evidence presented must be "viewed in the light most favorable to the non-moving party," and all inferences must be drawn in favor of the non-movant. *Furr v. K-Mart Corp.*, 142 N.C. App. 325, 327, 543 S.E.2d 166, 168 (2001) (quotations omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2015). If the movant can show an absence of a genuine issue of material fact, the burden then shifts to the non-movant to produce evidence to establish a genuine issue. *Jones*, 362 N.C. at 573, 669 S.E.2d at 576. We conclude that Premier has successfully shown a complete lack of evidence regarding such affirmative acts, and that Defendants failed to provide evidence that the individual Hospital Sites, and not the Hospital Networks for which Defendants have already been compensated, took such affirmative acts.

Defendants first contend that the work of an Infection Preventionist to identify health related issues that will trigger alerts, coupled with the software's firing of alerts, constitutes an affirmative act taken by the Hospital Site to subscribe to

SafetySurveillor.  We have already held that firing of alerts alone is insufficient. *Premier, Inc. I*, 232 N.C. App at 609, 755 S.E.2d at 61.

According to the Law of the Case Doctrine, "an appellate court ruling on a question governs the resolution of that question both in subsequent proceedings in the trial court and on a subsequent appeal, provided the same facts and the same questions, which were determined in the previous appeal, are involved in the second appeal." *Creech v. Melnik*, 147 N.C. App. 471, 473-74, 556 S.E.2d 587, 589 (2001) (citation omitted).

In *Premier, Inc. I*, this Court determined that the firing of alerts and "the circumstances under which the product came to be received by these facilities is probative of the issue of whether the facilities did, in fact, meet the criteria for Product Implementation[,]" but that firing of alerts is not enough in and of itself. *Premier, Inc. I*, 232 N.C. App at 609, 755 S.E.2d at 61.  The record during the first appeal was completely devoid of specific evidence concerning how these facilities received the software.  *Id.* at 609, 755 S.E.2d at 61.  Following an additional opportunity to take discovery on remand, the record remains devoid of any such evidence, and the Law of the Case Doctrine prohibits this Court from reconsidering this issue.

Defendants next contend that, for Premier to be compliant with the Health Insurance Portability and Accountability Act ("HIPPA"), a Business Associate Agreement ("BAA") must necessarily exist between the Hospital Site and Premier prior to any exchange of patient information.  Based on this, Defendants ask us to

accept that a BAA exists between Premier and every Hospital Site at issue. Defendants maintain that the signing of a BAA constitutes the requisite affirmative act taken by the Hospital Sites necessary to show that Product Implementation occurred. However, there is no record evidence that Premier is in fact HIPPA compliant. Defendants took no steps to obtain evidence of any specific BAA that may exist between Premier and the Hospital Sites. In fact, the record before this Court has over 2,000 pages, but there is only one "example" BAA in the record.

Even if we assume *arguendo* that Premier is HIPPA compliant, the exchange of information between Premier and the Hospital Sites alone does not necessarily prove that a BAA exists between Premier and that Hospital Site. Therefore, the HIPPA-compliant exchange of information between Premier and these Hospital Sites does not demonstrate the existence of an affirmative act that would trigger an Earnout Amount payment.

In *Premier, Inc. I*, we determined that "the unmistakable meaning of the language the parties agreed upon in drafting the Agreement is that some affirmative act on the part of the Hospital Site is required." *Premier, Inc. I*, 232 N.C. App. at 607, 755 S.E.2d at 60. The Agreement "contemplates a mutual arrangement between Premier and the Hospital Site whereby Premier agrees to provide the SafetySurveillor product and the Hospital Site agrees to accept it and utilize its services." *Id.* at 608, 755 S.E.2d at 61.

SafetySurveillor receives Protected Health Information ("PHI") transferred from the source site to the system operator. The transfer of PHI is governed by

HIPPA.  *See* 45 C.F.R. § 160 *et seq.* (2016).  Although a Hospital Site may freely share information with other entities in the Hospital Network and remain HIPPA compliant, *see* 45 C.F.R. § 164.506(c)(5), a Hospital Site or Network must have a BAA in place with any third party in order to share data with that entity.  45 C.F.R. § 164.504(e)(2)(i)(B).  It is possible for a BAA between a third party and the Hospital Network to provide for the free exchange of patient information between an individual Hospital Site and the third party, even when there is no BAA directly between them.  *See generally* 45 C.F.R. §§ 164.502, 164.508.  In such a scenario, the parent Hospital Network signs the BAA on *behalf* of the individual Hospital Sites.  45 C.F.R. § 164.502(a)(3).  However, a Hospital Network signing on a Hospital Site's behalf is not demonstrative, as this Court previously held, of "the Hospital Site agree[ing] to accept [SafetySurveillor] and utilize its services."  *Premier, Inc. I*, 232 N.C. App. at 608, 755 S.E.2d at 61.

In the instant case, the parties have provided evidence in the form of depositions, affidavits, and one example BAA between Premier and one Hospital Network.  However, even with additional time for discovery, the denial of Premier's Motion for Protective Order, and specific instruction from this Court regarding the evidence needed, Defendants declined to take third-party discovery to determine whether even one of the Hospital Sites in dispute, and not the Hospital Networks, took any affirmative steps to *accept* SafetySurveillor.  Since the record evidence only shows that the Hospital Networks signed the BAA *on behalf of* the Hospital Sites, and Defendants failed to produce evidence of acceptance of SafteySurveillor *by* the

Hospital Sites as required in *Premier, Inc. I*, the mere existence of a BAA does not prove that an affirmative action was taken by the Hospital Sites themselves. Even after having the opportunity to develop more fully the factual record on remand from this Court, Defendants have failed to demonstrate that they are entitled to an Earnout Amount on the basis of any of the disputed Hospital Sites. Accordingly, the trial court's grant of summary judgment in favor of Premier was appropriate.

## Conclusion

Defendants failed to provide evidence of affirmative acts taken by the Hospital Sites at issue to "subscribe to" or "license" SafetySurveillor. Therefore, Premier is not required to provide an Earnout Amount to Defendants for the disputed Hospital Sites. Accordingly, for the reasons stated above, we affirm the ruling of the trial court.

AFFIRMED.

Judge STROUD concurs.

Judge DILLON concurs by separate opinion.

DILLON, Judge, concurring.

I concur based on the conclusion that we are bound by holdings of our Court in the first appeal of this case, reported at *Premier, Inc. v. Peterson*, 232 N.C. App. 601, 755 S.E.2d 56 (2014) (hereinafter "*Premier I*"). Specifically, we are bound by the narrow definition of "subscribe" only to mean "to agree to receive and pay for a periodical service[,]" (quoting Webster's Dictionary), and that the term connotes "an affirmative act by the recipient *prior* to receipt of the product or service." *Id.* at 608, 755 S.E.2d at 61 (emphasis added). We are also bound by the holding in *Premier I* that the evidence that had been "discovered" to that point in the litigation was *not* sufficient to create a genuine issue of fact, and remanded to give Defendant a chance to engage in discovery to uncover additional evidence. Defendant, however, has failed to point to any evidence that was "discovered" since the first appeal. Accordingly, we are compelled to affirm.

I note that in its definition of "subscribe," Webster's does not require an affirmative act which occurs *prior to* receipt of the product, as *Premier I* suggests. Webster's lists other definitions for "subscribe" as well, such as to "sanction" and to "assent to." Here, I believe that the term "subscribe" is sufficiently ambiguous to include Hospital Sites within networks where the network had a contract with Premier but where the Hospital Site received the product, but then implemented the

product – where the inputting of patient data and other acts to implement the product constitute affirmative acts of "Product Implementation" to constitute "sanction[ing]" and "assent[ing] to" the product. And perhaps the best evidence concerning the parties' intent in their use of the word "subscribe" was evidence of Premier's relationship with the Hospital Sites identified in Section 2(b)(iii) of the Disclosure Schedule of the agreement, in which the parties agreed where Product Implementation had occurred. For example, it would be interesting if some of the Sites that implemented the product which are listed as part of a network did not actually have a direct formal agreement with Premier but were included because they were part of a network which did have a formal agreement. But the record is silent on this issue.