IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-521

No. COA20-464

Filed 5 October 2021

Office of Administrative Hearings, No. 17 OSP 08518

JUDITH M. AYERS, Petitioner,

v.

CURRITUCK COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent.

Appeal by Respondent from final decision entered 5 May 2020 by Administrative Law Judge Melissa Owens Lassiter in the Office of Administrative Hearings. Heard in the Court of Appeals 23 March 2021.

*Hornthal, Riley, Ellis, & Maland, L.L.P., by John D. Leidy, for petitioner-appellee.*

*The Twiford Law Firm, P.C., by John S. Morrison, for respondent-appellant.*

MURPHY, Judge.

¶ 1     When a party challenges findings of fact and conclusions of law in an administrative law judge's ("ALJ") order reviewing discipline of a career State employee, we conduct a whole record test to determine whether substantial evidence supported the findings of fact and review the challenged conclusions of law de novo. When determining whether an agency had just cause for the disciplinary action taken against a career State employee, we must evaluate: (1) whether the employee engaged in the conduct the employer alleges; (2) whether the employee's conduct qualifies as

unacceptable personal conduct under the North Carolina Administrative Code; and (3) whether that employee's misconduct amounted to just cause for the disciplinary action taken. *See Warren v. N.C. Dep't. of Crime Control & Pub. Safety*, 221 N.C. App. 376, 382-83, 726 S.E.2d 920, 925, *disc. rev. denied*, 366 N.C. 408, 735 S.E.2d 175 (2012).

¶ 2 However, when the Record shows an agency failed to consider a necessary factor in determining appropriate disciplinary action to take against a career State employee, resulting in the agency's failure to fully exercise its discretionary review under *Wetherington v. N.C. Dep't of Pub. Safety*, the ALJ must remand to the agency for an investigation that considers each required factor. Without the agency's full consideration of all factors, we cannot conduct an adequate de novo review on appeal. *See Wetherington v. N.C. Dep't of Pub. Safety*, 368 N.C. 583, 592, 780 S.E.2d 543, 548 (2015) ("*Wetherington I*"). Here, the agency failed to consider a required factor under *Wetherington I*–resulting harm from the career State employee's unacceptable personal conduct–in its decision to terminate the career State employee, and the administrative law judge failed to remand this matter to the agency for a complete investigation and consideration of the required factor.

## **BACKGROUND**

¶ 3 Respondent-Appellant Currituck County Department of Social Services ("DSS" or "the agency") brings its second appeal in this case. While facts from this case are

set out in the original appeal, *Ayers v. Currituck Cty. Dep't of Soc. Servs.*, 267 N.C. App. 513, 514-17, 833 S.E.2d 649, 651-53 (2019) ("*Ayers I*"), we include a recitation of "the facts and procedural history relevant to the issues currently before us." *Premier, Inc. v. Peterson*, 255 N.C. App. 347, 348, 804 S.E.2d 599, 601 (2017).

## A. Prior to Incident

¶ 4        Petitioner-Appellee Judith Ayers had been employed with DSS from 2007 until the incident in 2017. Ayers was the supervisor for the Child Protective Services Unit at DSS who reported directly to the DSS Director. Neither party contests that Ayers was a career State employee.[1]

¶ 5        Ayers consistently received positive work performance reviews and had never been disciplined as a DSS employee before the incident occurred. Until 30 June 2017, her boss was the DSS Director, Kathy Romm, who had hired Ayers; Romm had asked Ayers whether she wanted to take her position upon Romm's retirement. Ayers declined to pursue the position, and Romm hired another DSS employee, Samantha Hurd. Both Ayers and Hurd are Caucasian women.

---

[1] "Career State employee" is a term of art defined in N.C.G.S. § 126-1.1 as follows: "'[C]areer State employee' means a State employee or an employee of a local entity who is covered by this Chapter pursuant to [N.C.G.S. §] 126-5(a)(2) who: (1) Is in a permanent position with a permanent appointment, and (2) Has been continuously employed by the State of North Carolina or a local entity as provided in [N.C.G.S. §] 126-5(a)(2) in a position subject to the North Carolina Human Resources Act for the immediate 12 preceding months." N.C.G.S. § 126-1.1(a) (2019). At the time of the incident and subsequent termination, Ayers was a career State employee.

¶ 6    Prior to Hurd's promotion, she supervised DSS's Foster Care Unit, and she and Ayers had a history of disagreements and conflict in their roles. The disagreements and conflict continued after Hurd's promotion.

## B. Incident

¶ 7    On 3 November 2017, Hurd asked Ayers about a racial demarcation–"NR"– that a social worker had included on a client intake form; Hurd did not recognize the demarcation, asked Ayers what it stood for multiple times, and Ayers responded with a racial epithet. Ayers claimed she said "nigra rican," while Hurd claimed Ayers said "[n-----] rican" ("the N word"). According to testimony from Hurd and Ayers, Ayers initially laughed about the comment, but became apologetic and embarrassed soon afterward. After investigation, Hurd and Ayers discovered the client referred to on the form was Caucasian.

## C. Disciplinary Action

¶ 8    The incident occurred on Friday, 3 November 2017, and Hurd conferred with DSS's counsel over the following weekend. After receiving guidance, Hurd applied a twelve-factor test, derived from a guide for North Carolina public employers published by the University of North Carolina at Chapel Hill Institute of Government, to Ayers's comment and instituted disciplinary proceedings against her

on Monday, 6 November 2017. The twelve-factor test[2] included the following

considerations:

> 1. The nature and the seriousness of the offense and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, was committed maliciously or for gain, or was frequently repeated.
>
> 2. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position.
>
> 3. The employee's past disciplinary record.
>
> 4. The employee's past work record, including length of service, performance on the job, ability to get along with fellow workers and dependability.
>
> 5. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon [the] supervisor's confidence in the employee's ability to perform assigned duties.
>
> 6. The consistency of the penalty with those imposed[] upon other employees for the same or similar offenses.
>
> 7. The impact of the penalty upon the reputation of the agency[.]
>
> 8. The notoriety of the offense or its impact upon the reputation of the agency.
>
> 9. The clarity with which the employee was aware of any rules that were violated in committing the offense or had

---

[2] Hurd obtained this twelve-factor test from the third edition of *Employment Law: A Guide for North Carolina Public Employers*, by Stephen Allred. *See* Stephen Allred, *Employment Law: A Guide for North Carolina Public Employers* (3d ed. 1999).

been warned about the conduct in question.

10. The potential for the employee's rehabilitation.

11. The presence of mitigating circumstances surrounding the offense such as unusual job tension; personality problems[;] mental impairment; harassment; or bad faith, malice or provocation on the part of others involved in the matter.

12. The adequacy and the effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

¶ 9        After meeting with Ayers, Hurd placed her on investigatory status with pay, and subsequently terminated her employment with DSS; Ayers appealed, and Hurd affirmed her decision. Ayers filed a *Petition for a Contested Case Hearing* with the Office of Administrative Hearings.

### D. 13 June 2018 ALJ Decision

¶ 10        An ALJ held a contested case hearing on 19 April 2018 and reversed Hurd's termination decision in a *Final Decision* filed 13 June 2018 ("First ALJ Order"). Findings of Fact 23 and 47 in the First ALJ Order described Ayers's and Hurd's different recollections of the word Ayers used, but the First ALJ Order also included the word "negra-rican," which was a third variation of the word. A fourth variation, "negro-rican," appeared in Conclusion of Law 13. The ALJ applied the three-prong test from *Warren*, determined the first prong of "whether the employee engaged in the conduct the employer alleges[,]" was not met in light of the disagreements on

verbiage, and reversed Hurd's termination of Ayers. *See Warren*, 221 N.C. App. at 382-83, 726 S.E.2d at 925. DSS appealed the First ALJ Order.

### E. *Ayers I*

In an opinion filed 1 October 2019, we vacated and remanded the First ALJ Order. *Ayers I*, 267 N.C. App. at 513, 833 S.E.2d at 649. We noted Finding of Fact 23 from the First ALJ Order, which included a third and incorrect variation of the word used when describing the disagreement on epithet verbiage between Ayers and Hurd, was the "critical finding driving the ALJ's analysis" in its reversal of Hurd's termination decision. *Id.* at 523, 833 S.E.2d at 656. We found,

> the ALJ's [f]inding is not supported by the evidence in the Record[, particularly Ayers's own testimony]. It is then apparent the ALJ carried out the remainder of its analysis under the misapprehension of the exact phrase used and that the ALJ's understanding of the exact phrase used was central to both the rest of the ALJ's [f]indings and its [c]onclusions of [l]aw. Therefore, we vacate the [First ALJ Order] in its entirety and remand this matter for the ALJ to reconsider its factual findings in light of the evidence of record and to make new conclusions based upon those factual findings.

*Id.* at 524, 833 S.E.2d at 656-57. In addition to noting "the ALJ's conclusions and considerations of the 'totality of the circumstances' were also grounded in its misapprehension of the evidentiary record[,]" we held either "'n----- rican' or the variant 'nigra rican'" "constitute[d] a racial epithet[,]" and DSS "met its initial burden of proving [Ayers] engaged in the conduct alleged under *Warren*." *Id.* at 525-26, 833

S.E.2d at 657-58. In vacating the First ALJ Order, we instructed the ALJ to "make new findings of fact supported by the evidence in the record and continue its analysis under *Warren* of whether [Ayers] engaged in unacceptable conduct constituting just cause for her dismissal or for the imposition of other discipline." *Id.* at 526-27, 833 S.E.2d at 658.[3]

### F. ALJ Decision on Remand

¶ 12         On remand, the ALJ entered its *Final Decision on Remand* ("Second ALJ Order") on 5 May 2020, made additional findings of fact and conclusions of law, applied the three-prong *Warren* test, and reversed DSS's termination of Ayers. The ALJ decided the first two prongs of the *Warren* test–Ayers engaging in the conduct alleged and the conduct constituting unacceptable personal conduct–were met. Ayers, as the appellee, does not contest that decision. However, the ALJ concluded the third prong of the *Warren* test–whether DSS had just cause for the disciplinary action taken under N.C.G.S. § 126-35(a)–was not met. *See Warren*, 221 N.C. App. at 383, 726 S.E.2d at 925. In concluding a lesser disciplinary measure was warranted,

---

[3] In our review of the First ALJ Order in *Ayers I*, we reversed "the ALJ's conclusion that DSS 'failed to prove the first prong of *Warren*[,]'" and further held, "on remand, the ALJ should make new findings of fact supported by the evidence in the record and continue its analysis under *Warren* of whether [Ayers] engaged in unacceptable conduct constituting just cause for her dismissal or for the imposition of other discipline." *Ayers I*, 267 N.C. App. at 526-27, 833 S.E.2d at 658. As such, *Ayers I* did not reach the third prong of the *Warren* test– whether that employee's misconduct amounted to just cause for the disciplinary action taken. *Warren*, 221 N.C. App. at 383, 726 S.E.2d at 925. Here, the third prong of the *Warren* test is at issue for the first time.

the Second ALJ Order focused on: Ayers's "ten-year employment history with no prior disciplinary actions" and high performance reviews; that Hurd "did not think it was significant whether anyone heard [Ayers's] comment"; the lack of evidence that this one-time comment was harassment of a specific individual or caused actual harm to DSS, until DSS revealed the incident to others; and that DSS's decision "was influenced by . . . past philosophical differences [between Hurd and Ayers] and their past history." However, the Second ALJ Order also found that "[DSS] did not consider if [Ayers's] . . . comment caused any actual harm to the agency's reputation. [DSS] only considered potential harm to the agency." The Second ALJ Order also acknowledged the lack of resolution regarding whether anyone other than Hurd heard Ayers's epithet, which the ALJ deemed a "necessary consideration." Despite the lack of resolution of the resulting harm factor from *Wetherington I*, the Second ALJ Order retroactively reinstated Ayers with a two-week suspension without pay, ordered back pay, and ordered reimbursement of Ayers's attorney fees. *See Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548.

¶ 13 DSS appeals the Second ALJ Order and presents the following three arguments: (A) "the ALJ made findings of fact not supported by substantial evidence" in its Second ALJ Order; (B) specific conclusions of law from the Second ALJ Order are erroneous; and, (C) DSS "had just cause to dismiss [Ayers]." After analyzing the nature of ALJ and appellate court review of an agency's disciplinary decision

regarding a career State employee, including standards of review, we determine that our appellate review cannot meaningfully be conducted in light of DSS's investigation and the Second ALJ Order.

## ANALYSIS

### A. ALJ Review of Career State Employee Discipline

A career State employee may be disciplined for two reasons: unsatisfactory job performance ("UJP") or unacceptable personal conduct ("UPC"). *See* 25 N.C.A.C. 1J.0604(b) (2019). Under the North Carolina Administrative Code, just cause for the written warning, dismissal, suspension, or demotion of a career State employee may be established only on a showing of UPC or UJP, "including grossly inefficient job performance." 25 N.C.A.C. 1J.0604(a)-(b) (2019). Here, UJP is not the proffered reason for DSS's discipline of Ayers; instead, UPC is at issue.

UPC includes, *inter alia*, the following examples, which DSS accused Hurd of committing:

> (a) conduct for which no reasonable person should expect to receive prior warning;
>
> . . .
>
> (d) the willful violation of known or written work rules;
>
> (e) conduct unbecoming a [S]tate employee that is detrimental to [S]tate service . . . .

25 N.C.A.C. 1J.0614(8)(a), (d), (e) (2019); *see Ayers I*, 267 N.C. App. at 521-22, 833

S.E.2d at 655. Where a career State employee has committed UJP or UPC, "[t]he North Carolina Administrative Code sets forth four disciplinary alternatives, which may be imposed against an employee upon a finding of just cause: '(1) [W]ritten warning; (2) Disciplinary suspension without pay; (3) Demotion; and (4) Dismissal.'" *Harris v. N.C. Dep't of Pub. Safety*, 252 N.C. App. 94, 108, 798 S.E.2d 127, 137 (quoting 25 N.C.A.C. 1J.0604(a) (2017)), *aff'd per curiam*, 370 N.C. 386, 808 S.E.2d 142 (2017).

¶ 16     An ALJ has authority to impose discipline that is different from what the agency originally decided, as long as that discipline is approved under the North Carolina Administrative Code and just cause did not exist for the discipline imposed by the agency.

> An ALJ, reviewing an agency's decision to discipline a career State employee within the context of a contested case hearing, owes no deference to the agency's conclusion of law that . . . just cause existed . . . [for] the agency's action. . . . [W]hether just cause exists is a conclusion of law, which the ALJ had authority to review *de novo*.
>
> . . . .
>
> Because the ALJ hears the evidence, determines the weight and credibility of the evidence, makes findings of fact, and balances the equities, the ALJ has the authority under *de novo* review to impose an alternative discipline. Upon the ALJ's determination that the agency met the first two prongs of the *Warren* standard, but just cause does not exist for the particular disciplinary alternative imposed by the agency, the ALJ may impose an alternative sanction

within the range of allowed dispositions.

*Harris*, 252 N.C. App. at 102, 109, 798 S.E.2d at 134, 138 (marks and citations omitted).

¶ 17        In conducting its de novo review of the agency's disciplinary investigation and determination, an ALJ reviews, *inter alia*, whether the agency, in the agency's discretionary review of whether to discipline a career State employee, considered the following required factors:

> [T]he severity of the violation, the subject matter involved, the resulting harm, the [career State employee's] work history, or discipline imposed in other cases involving similar violations. . . . [C]onsideration of these factors is an appropriate *and necessary component* of a decision to impose discipline upon a career State employee for [UPC].

*Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548 (emphasis added).

### B. Appellate Court Just Cause Review

¶ 18        "It is well settled that in cases appealed from administrative tribunals, questions of law receive *de novo* review, whereas fact-intensive issues such as sufficiency of the evidence to support an agency's decision are reviewed under the whole-record test." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 659, 599 S.E.2d 888, 894 (2004) (marks omitted). "An appellate court's standard of review of an agency's final decision–and now, an administrative law judge's final decision–has been, and remains, whole record on the findings of fact and *de novo* on the conclusions

of law." *Harris*, 252 N.C. App. at 102, 798 S.E.2d at 134.

¶ 19 Accordingly, "[d]etermining whether a public employer had just cause to discipline its employee *requires two separate inquiries*: first, whether the employee engaged in the conduct the employer alleges, and second, whether that conduct constitutes just cause for the disciplinary action taken." *Carroll*, 358 N.C. at 665, 599 S.E.2d at 898 (emphasis added) (marks omitted). "The first half of the inquiry, *Carroll* instructs us, is a question of fact to be examined under the whole record test. The second half, by contrast, is a question of law to be examined *de novo*." *Early v. Cty. of Durham Dep't of Soc. Servs.*, 172 N.C. App. 344, 360, 616 S.E.2d 553, 564 (2005) (citing *Carroll*, 358 N.C. at 665-66, 599 S.E.2d at 898), *disc. rev. improvidently allowed*, 361 N.C. 113, 637 S.E.2d 539 (2006).

¶ 20 While the application of the whole record test to questions of fact is important,

> the fundamental question in a case brought under N.C.G.S. § 126-35 is whether the disciplinary action taken was just. Inevitably, this inquiry requires an irreducible act of judgment that cannot always be satisfied by the mechanical application of rules and regulations. Just cause is a flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case.

*Wetherington I*, 368 N.C. at 591, 780 S.E.2d at 547 (marks and citation omitted); *see* N.C.G.S. § 126-35(a) (2019) ("No career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary

reasons, except for just cause."). "Whether conduct constitutes just cause for the disciplinary action taken is a question of law we review *de novo*." *Warren*, 221 N.C. App. at 378, 726 S.E.2d at 923.

¶ 21 *Warren* summarized this precedent as follows:

> Just cause, like justice itself, is not susceptible of precise definition. It is a flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case. Thus, not *every* violation of law gives rise to just cause for employee discipline.
>
> . . . .
>
> We conclude that the best way to accommodate the Supreme Court's flexibility and fairness requirements for just cause is to balance the equities after the unacceptable personal conduct analysis. This avoids contorting the language of the Administrative Code defining unacceptable personal conduct.[] The proper analytical approach is to *first determine* whether the employee *engaged in the conduct* the employer alleges. The *second inquiry* is whether the employee's conduct falls within one of the categories of *unacceptable personal conduct* provided by the Administrative Code. Unacceptable personal conduct does not necessarily establish just cause for all types of discipline. If the employee's act qualifies as a type of unacceptable conduct, the tribunal proceeds to the *third inquiry*: *whether that misconduct amounted to just cause for the disciplinary action taken*. Just cause must be determined based upon an examination of the facts and circumstances of each individual case.

*Id.* at 381, 382-83, 726 S.E.2d at 924, 925 (emphases added) (marks and footnote omitted).

**C. Meaningful Appellate Review**

Here, the first two prongs under *Warren*–whether Ayers engaged in the conduct the agency alleges and whether that conduct falls within disciplinable UPC– were met. Whether just cause existed for DSS to terminate Ayers's employment is the subject of this appeal, which we review de novo. *Id.* at 378, 726 S.E.2d at 923.

However, the ALJ found DSS did not consider one of the required factors under *Wetherington I*–the resulting harm from Ayers's UPC. *See Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548. In challenging the Second ALJ Order, DSS does not address the *Wetherington I* factors, but instead emphasizes that Hurd appropriately used her discretion in making the disciplinary decision after thoroughly conducting the twelve-factor analysis from Stephen Allred's UNC School of Government publication *Employment Law: A Guide for North Carolina Public Employers*. *See* Stephen Allred, *Employment Law: A Guide for North Carolina Public Employers* (3d ed. 1999). The factors Hurd considered are listed in Finding of Fact 69, and do not include "resulting harm." *See Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548 (requiring consideration of the "resulting harm" from the career State employee's violation). DSS relies on our interpretation of *Wetherington I* in *Wetherington v. N.C. Dep't of Pub. Safety*, 270 N.C. App. 161, 840 S.E.2d 812 ("*Wetherington II*"), *disc. rev. denied*, 374 N.C. 746, 842 S.E.2d 585 (2020), to emphasize Hurd's discretion in making the decision to discipline Ayers. In *Wetherington II*, we stated: "Although the

primary holding in [*Wetherington I*] was that public agency decision-makers must use discretion in determining what disciplinary action to impose in situations involving alleged unacceptable personal conduct, the Court did identify factors that are appropriate and necessary components of that discretionary exercise." *Wetherington II*, 270 N.C. App. at 190, 840 S.E.2d at 832 (quoting *Brewington v. N.C. Dep't of Pub. Safety*, 254 N.C. App. 1, 25, 802 S.E.2d 115, 131 (2017), *disc. rev. denied*, 371 N.C. 343, 813 S.E.2d 857 (2018)). DSS emphasizes our inclusion of "must use discretion" and "discretionary exercise" in the above quote and claims Hurd properly exercised her discretion through consideration of the factors, "all facts and circumstances, [and] different available punishments[.]"

¶ 24 However, *Wetherington I*, and our reasoning in *Wetherington II*, exemplify that DSS did not properly exercise its discretion in its disciplinary investigation of Ayers. In *Wetherington II*, we characterized the *Wetherington I* factors–severity of the violation, subject matter involved, resulting harm, work history, and discipline imposed in other similar cases–as "appropriate and necessary components" for consideration when an agency makes a disciplinary decision regarding a career State employee. *Id.* Additionally, we emphasized the "[r]espondent was directed to consider *all of these factors*, at least to the extent there was any evidence to support them. [The] [r]espondent could not rely on one factor while ignoring the others." *Id.* (emphasis added); *see also Wetherington I*, 368 N.C. at 592, 780 S.E.2d at 548. Similar

to the respondent in *Wetherington II*, DSS was required to consider all of the factors from *Wetherington I*. However, the ALJ found that Hurd, as DSS's representative in the disciplinary decision regarding Ayers, did not consider the necessary resulting harm factor, and thus did not consider all of the required factors.[4]

¶ 25      The ALJ's Findings of Fact 71 and 74–that DSS did not consider the required factor of resulting harm–are also supported by substantial evidence in the Record.[5] *See Harris*, 252 N.C. App. at 107, 798 S.E.2d at 137 (marks omitted) ("We afford a high degree of deference to the ALJ's findings, when they are supported by substantial evidence in the record."). DSS did not consider whether there was any harm to DSS in its consideration of discipline for Ayers, despite the detailed nature of Hurd's investigation. Instead, Hurd's testimony revealed she considered the *potential* for harm to the reputation of, and workers at, DSS and acknowledged the lack of evidence that anyone other than her heard Ayers's epithet. On cross-examination, Hurd testified:

> [AYERS'S COUNSEL:] You're talking about [considering] the potential for harm, right?
>
> [HURD:] Yes, sir.
>
> [AYERS'S COUNSEL:] But I'm asking whether you considered whether there was any actual harm resulting

---

[4] Hurd admitted to her lack of investigation and consideration of the resulting harm to DSS from Ayers's UPC in the disciplinary decision.

[5] On appeal, DSS challenges Findings of Fact 33, 39, 50, 55, 60, 67, 71, 74, 76, 77, and 82 as not supported by substantial evidence.

from her statement?

[HURD:] Well, I don't know. I guess it depends on how it could be defined. She called the -- she referred to the children in the F family as [the N word] rican, and I heard it. I thought that was extremely offensive and inflammatory.

[AYERS'S COUNSEL:] But you have no evidence that they were harmed in any way by her statement, right?

[HURD:] Well, not that I know of.

Substantial evidence supports the ALJ's determination that Hurd, and DSS, did not consider a required factor under *Wetherington I*.

In *Wetherington I*, when our Supreme Court determined the employing agency did not conduct its discretionary disciplinary review appropriately, it remanded to the employing agency for a disciplinary review that employed, *inter alia*, the consideration of the factors required. *Wetherington I*, 368 N.C. at 593, 780 S.E.2d at 548. Under *Wetherington I*, the ALJ and subsequently reviewing courts are tasked with conducting de novo review of DSS's disciplinary decision, relying on corresponding findings of fact from the ALJ regarding whether just cause existed to terminate Ayers; DSS's disciplinary investigation must be complete for proper, subsequent review of that decision to occur.

As a result of DSS's incomplete investigation, a remand was necessary for a completion of that investigation, and we cannot conduct meaningful de novo appellate review regarding whether just cause existed to terminate Ayers. *See Mills v. N.C.*

*Dep't of Health & Human Servs.*, 251 N.C. App. 182, 193-95, 794 S.E.2d 566, 573-74 (2016) (noting "inadequacies in the ALJ's analysis frustrate meaningful [appellate] review"). DSS's failure to consider the resulting harm to the agency from Ayers's UPC was a failure to fully exercise its discretionary review under *Wetherington I*. The incomplete nature of DSS's investigation, as well as the ALJ's de novo review of DSS's disciplinary decision, is demonstrated by Conclusion of Law 24 from the Second ALJ Order, which stated "Hurd admitted that she did not think it was significant whether anyone heard [Ayers's] comment on [3 November 2017]. However, *whether* anyone else heard such statement was a *necessary consideration* in weighing the evidence *to determine* the severity of the conduct and *whether just cause existed* to terminate [Ayers]." (Emphases added). DSS did not make such a necessary consideration in its disciplinary investigation, rendering the investigation incomplete and the ALJ's findings regarding whether such harm occurred too speculative. For us to conduct meaningful appellate review regarding just cause for disciplinary action, the ALJ must make complete findings of fact regarding the harm to DSS resulting from Ayers's UPC, including whether any occurred. *See Wetherington I*, 368 N.C. at 593, 780 S.E.2d at 548. The ALJ can only make such findings if DSS conducts a complete investigation under *Wetherington I*.

¶ 28    Similar to our Supreme Court's mandate in *Wetherington I*, we must remand to the ALJ with instructions to remand to DSS to conduct a complete, discretionary

review regarding Ayers's UPC and corresponding disciplinary action.

**CONCLUSION**

¶ 29    From a review of the Record and Transcript, DSS did not consider the necessary factor of resulting harm in her determination regarding whether and how to discipline Ayers.  The ALJ's determination in the Second ALJ Order that DSS's investigation into Ayers's conduct was incomplete comports with *Wetherington I* and *II*.  Under *Wetherington I*, the appropriate remedy was to remand this matter to DSS with instructions to conduct a complete disciplinary investigation regarding Ayers's UPC.  We remand to the ALJ with instructions to remand this matter to DSS for additional proceedings not inconsistent with this opinion.

REMANDED.

Judge DIETZ concurs.

Judge GORE concurs with separate opinion.

GORE, Judge, concurring.

¶ 30    I concur with the majority in its legal reasoning. However, I must draw attention to the concern I have for our current law to require a resulting harm in an employee and agency dispute that is charged with the unwavering responsibility of protecting children in North Carolina. Social workers employed by County Department of Social Services ("DSS") are on the front line of the battle against harm that might come to our children. The facts of this case are concerning.

¶ 31    I am troubled that our law requires a resulting harm that involves employees charged with protecting children. I know this standard is balanced against the rights afforded to state employees. However, I analyze that standard against the fact that the same state employees are responsible for substantiating facts related to the actual harm or risk of harm to children within areas of DSS care. It is arguable that a proven resulting harm to the agency might not directly affect a child in DSS care. In contrast, it can be put forth that anything negatively affecting DSS ultimately hurts a child in its care. It is this Court's responsibility to thoroughly analyze the law as it is and its results.

¶ 32    I want to make sure that it is discussed that conduct by state employees have varying degrees of resulting harm. A DSS employee's conduct that creates a resulting harm or even conduct that presents a risk of harm should not be taken lightly. Our child protective system works to prevent harm upon one of our most precious resources, our children, and the law should be equally vigilant. I hereafter concur.